**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

MOHAMMED AZIZ; MERAN SALIH
ABDULLAH; MOSSA ABDULLAH
MOSSA; SUTHI A. MOSSA; ZAKIA
SADULLA; KURDISH NATIONAL
CONGRESS OF NORTH AMERICA,
"KNC", On behalf of themselves
and all others similarly situated,

   *Plaintiffs-Appellants,*

    v.

ALCOLAC, INCORPORATED,

   *Defendant-Appellee,*    No. 10-1908

    and

REPUBLIC OF IRAQ, a sovereign
nation; VWR INTERNATIONAL, LLC,
a/k/a VWR International LTD,
f/k/a BDH, LTD; THERMO FISHER
SCIENTIFIC, INCORPORATED, f/k/a
Oxoid, LTD, a/k/a Oxoid,
Incorporated; JOHN DOES # 1-100,

   *Defendants.*

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Marvin J. Garbis, Senior District Judge.
(1:09-cv-00869-MJG)

Argued: May 12, 2011

Decided: September 19, 2011

Before MOTZ and DIAZ, Circuit Judges, and HAMILTON, Senior Circuit Judge.

---

Affirmed by published opinion. Judge Diaz wrote the opinion, in which Judge Motz and Senior Judge Hamilton concurred.

---

**COUNSEL**

**ARGUED:** Jeffrey David Katz, J D KATZ, PC, Bethesda, Maryland, for Appellants. Stephen James Marzen, SHEARMAN & STERLING LLP, Washington, D.C., for Appellee. **ON BRIEF:** Kenneth F. McCallion, MCCALLION & ASSOCIATES LLP, New York, New York, for Appellants. Jonathan L. Greenblatt, Christopher M. Ryan, Sean G. Arthurs, SHEARMAN & STERLING LLP, Washington, D.C., for Appellee.

---

**OPINION**

DIAZ, Circuit Judge:

We consider in this case whether the Appellants have alleged viable claims under the Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350, note, or the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350. The Appellants filed a class action complaint under these statutes, alleging that Defendant Alcolac, Inc., a chemical manufacturer, sold thiodiglycol ("TDG") to Saddam Hussein's Iraqi regime, which then used it to manufacture mustard gas to attack Kurdish enclaves in northern Iraq during the late 1980s.[1]

---

[1]The Appellants subsequently obtained leave of the district court to file an amended class action complaint ("Amended Complaint"), which is the operative pleading before us. The Appellants have also alleged claims against the Republic of Iraq, but this defendant has never been served and, to date, has not participated in these proceedings.

In granting Alcolac's motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the district court held that corporations are not subject to suit under the TVPA, and that the Appellants had not pleaded facts sufficient to support a reasonable inference that Alcolac provided TDG to Iraq with the purpose of facilitating genocide against the Kurds, which the district court determined was an element of a claim under the ATS.

We agree with the district court that the TVPA excludes corporations from liability. We further conclude that the ATS imposes liability for aiding and abetting violations of international law, but only if the attendant conduct is purposeful. The Appellants, however, have failed to plead facts sufficient to support the intent element of their ATS claims. Accordingly, we affirm the judgment of the district court.

## I.

### A.

For purposes of resolving this appeal, we accept as true the facts alleged by the Appellants in the Amended Complaint. In the 1980s, the Republic of Iraq, then under the dictatorial control of Saddam Hussein, was embroiled in a long-term armed conflict with Iran. International news media widely reported and the governments of many countries—including the United States, the United Kingdom, and Germany—explicitly condemned the Iraqi regime's large-scale use of mustard gas and other chemical weapons against Iran. Simultaneously, Iraq launched chemical weapon attacks against the Kurds in northern Iraq, whom Hussein accused of collaborating with Iran.

As a result, many international businesses, including commercial chemical manufacturers, cut off ties with Hussein's regime. In April 1984, following the issuance of an investigative report commissioned by the U.N. Secretary General finding that mustard gas and other chemical weapons had been

used in the Iraq-Iran war, an international coalition of governments known as the Australia Group[2] imposed licensing restrictions on the export of chemicals used in the manufacture of chemical weapons.

Alcolac, then a subsidiary of the British conglomerate Rio Tinto Zinc, began selling TDG under the trade name Kromfax in the early 1980s.[3] TDG has many lawful commercial applications; for example, it is used as a solvent in dyeing textiles and producing inks. As early as 1982, however, Alcolac was also aware that TDG could be used to manufacture mustard gas.

Representatives from the U.S. Customs Service and the U.S. State Department specifically warned Alcolac that TDG was subject to export restrictions. Despite these warnings, in late 1987 Alcolac fulfilled an order for 120 tons of Kromfax from Colimex, a German company. This order, about ten times larger than any Alcolac had ever received, was eventually transshipped to Iran via Singapore.

In late 1987 and early 1988, Alcolac also delivered four shipments of Kromfax totaling over one million pounds to NuKraft Mercantile Corporation, a company in Brooklyn, New York, with whom Alcolac had not previously done business. Alcolac knew that NuKraft was a shell corporation created to facilitate the purchase of Kromfax for shipment to Europe and transshipment elsewhere via a Swiss company identified as "Companies Inc.," and that NuKraft intended to place further orders in the three to six million pound range annually.

---

[2]The Australia Group included Australia, France, Germany, Italy, Japan, South Korea, the Netherlands, New Zealand, Norway, Romania, the United Kingdom, the United States, and Switzerland.

[3]In late 1989, Rhone-Poulenc S.A., a French chemical company, acquired Alcolac from Rio Tinto Zinc. Alcolac today is a Georgia (U.S.) corporation owned by Rhodia, Inc., a U.S. subsidiary of Rhodia S.A., a French chemical company.

In February 1989, Alcolac pleaded guilty to a single count of violating the Export Administration Act, 50 U.S.C. app. § 2410(a), in connection with the 1987 Kromfax order to Colimex. During the plea hearing, the government also proffered facts relating to a sale of Kromfax to NuKraft that the government believed ultimately reached Iraq; however, Alcolac was not prosecuted for that sale.

The four Kromfax shipments that Alcolac delivered to NuKraft did reach Iraq, where they were processed to manufacture mustard gas used to attack the Kurds. The Iraqi regime's use of chemical weapons against the Kurds left thousands dead, maimed, or suffering from physical and psychological trauma.

## B.

The Appellants are individuals of Kurdish descent who are either victims of mustard gas attacks or family members of deceased victims. The Amended Complaint identifies two classes of plaintiffs. The Class A Plaintiffs, who are U.S. citizens and permanent residents, advance claims against Alcolac under the TVPA. The Class B Plaintiffs, who are foreign nationals, assert claims against Alcolac under the ATS. The district court granted Alcolac's motion to dismiss by memorandum and order dated June 9, 2010. The Appellants filed this timely appeal.

## II.

We review de novo a district court's decision to dismiss for failure to state a claim, assuming all well-pleaded, non-conclusory factual allegations in the complaint to be true. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009); *U.S. Airline Pilots Ass'n v. Awappa, LLC*, 615 F.3d 312, 317 (4th Cir. 2010). To survive a motion to dismiss pursuant to Rule 12(b)(6), plaintiffs' "[f]actual allegations must be enough to raise a right to relief above the speculative level," thereby

"nudg[ing] their claims across the line from conceivable to plausible." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). While a court must accept the material facts alleged in the complaint as true, *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999), statements of bare legal conclusions "are not entitled to the assumption of truth" and are insufficient to state a claim, *Iqbal*, 129 S. Ct. at 1950.

## III.

## A.

We first address the district court's dismissal of the TVPA claims. Enacted in 1992, the TVPA provides "a civil action for recovery of damages from an individual who engages in torture or extrajudicial killing." Pub. L. No. 102-256, 106 Stat. 73 (codified at 28 U.S.C. § 1350, note). In pertinent part, the TVPA states as follows:

> (a)   Liability.—An individual who, under actual or apparent authority, or color of law, of any foreign nation—
>
> > (1)   subjects an individual to torture shall, in a civil action, be liable for damages to that individual; or
> >
> > (2)   subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death.

*Id.* § 2(a).

The district court determined that Alcolac, as a corporation, is not an "individual" subject to liability under the TVPA. The

district court noted the absence of Fourth Circuit precedent and the presence of a circuit split on this question. *Compare Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254, 323-24, 337 (2d Cir. 2007) (dismissing TVPA claim against corporation "for the additional reason that only natural persons are subject to liability under it") (Korman, J., concurring in part and dissenting in part), *aff'd for lack of en banc quorum sub nom. Am. Isuzu Motors, Inc. v. Ntsebeza*, 553 U.S. 1028 (2008),[4] *with Romero v. Drummond Co.*, 552 F.3d 1303, 1315 (11th Cir. 2008) (allowing TVPA claim to proceed against a corporation). *See also Aldana v. Del Monte Fresh Produce, N.A.*, 416 F.3d 1242 (11th Cir. 2005). Here, the district court applied what it found to be "the more persuasive view" found in Judge Korman's concurring opinion in *Khulumani*. J.A. 408. The district court reasoned that the term "individual" referred in ordinary usage to a human being, described those who can both perpetrate and suffer torture, and should not have a different meaning depending on whether the term identified the perpetrator or the victim of torture.

## B.

Whether Alcolac is an "individual" within the meaning of the TVPA is a question of statutory interpretation. Our objective in all such cases is "to ascertain and implement the intent of Congress," and Congress's intent "can most easily be seen in the text of the Acts it promulgates." *Broughman v. Carver*, 624 F.3d 670, 674-75 (4th Cir. 2010) (internal citations and quotations omitted). In that regard, the Supreme Court has instructed that " 'courts must presume that a legislature says in a statute what it means and means in a statute what it says

---

[4]Following entry of the district court's order in this case, the D.C. Circuit and the Ninth Circuit also held that the TVPA imposes liability only on natural persons. *Mohamad v. Rajoub*, 634 F.3d 604, 607-09 (D.C. Cir. 2011), petition for cert. filed, 80 U.S.L.W. 3059 (U.S. July 15, 2011) (No. 11-88); *Bowoto v. Chevron Corp.*, 621 F.3d 1116, 1126 (9th Cir. 2010), petition for cert. filed, 80 U.S.L.W. 3004 (U.S. June 20, 2011) (No. 10-1536).

there. When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete.' " *Crespo v. Holder*, 631 F.3d 130, 136 (4th Cir. 2011) (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992)).

We hold that the TVPA admits of no ambiguity and Congress's intent to exclude corporations from liability under the TVPA is readily ascertainable from a plain-text reading.[5] To that end, unless there is "explicit legislative intent to the contrary," we are to give the words of a statute their "plain and ordinary meaning." *Carbon Fuel Co. v. USX Corp.*, 100 F.3d 1124, 1133 (4th Cir. 1996). Because Congress did not define "individual" in the TVPA, we are bound to give the word its ordinary meaning unless the context suggests otherwise. The plain and ordinary meaning of "individual" is "a single human being." RANDOM HOUSE WEBSTER'S UNABRIDGED DICTIONARY 974 (2d ed. 2001). And although the plain and ordinary meaning of "person" is also "a human being," the word often has a broader meaning in the law to include "a corporation, a partnership, an estate, or other legal entity . . . recognized by law as having rights and duties." *Id.* 1445.

This broader meaning is also consistent with that found in the Dictionary Act, which prescribes default rules of construction for interpreting acts of Congress. As is relevant here, the Dictionary Act provides that "[i]n determining the meaning of any Act of Congress, unless the context indicates otherwise . . . the word[ ] 'person' . . . include[s] corporations . . . as well as individuals." 1 U.S.C § 1 (2006). Thus, Congress has directed courts–-when interpreting a federal statute-–to give a broader reach to the noun "person" to include both corporations and individuals. In our view, then, when Congress uses the noun "individual"—rather than the broader term "per-

---

[5]The parties present contradictory views regarding the TVPA's legislative history. However, because the statutory text is clear, we do not address these arguments.

son"—it should ordinarily be construed to mean a human being or natural person.

This presumptive construction strikes us as particularly appropriate because there "is no indication Congress intended 'individual' to have a variety of meanings throughout the TVPA." *Bowoto*, 621 F.3d at 1127. As did the plaintiffs in *Bowoto*, the Appellants here "ask us to interpret 'individual' to mean a natural person when referring to the victim, but to mean either a natural person or a corporation when referring to the torturer." *Id.* We see no compelling reason, and the Appellants have not articulated one, for adopting such a schizophrenic construction of the TVPA. Instead, we apply the standard rule of statutory construction urging that identical words used in different parts of a statute be given the same meaning. *Comm'r v. Lundy*, 516 U.S. 235, 250 (1996) (in a case involving the interpretation of the term "claim" under the Internal Revenue Code, stating that "[t]he interrelationship and close proximity of [two statutory provisions] presents a classic case for application of the normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning") (internal citations and quotations omitted).

Additionally, we note that the term "person" appears in the TVPA, in reference to those "who may be [ ] claimant[s] in an action for wrongful death." 28 U.S.C. § 1350, note § 2(a)(2) (2006). As the D.C. Circuit recently noted, a claimant under the TVPA could be a juridical person, such as the estate of a victim-of-torture decedent. *See Mohamad*, 634 F.3d at 608. We conclude, as did the D.C. Circuit, that this distinction "further supports the significance of the Congress having used 'individual' rather than 'person' to identify who may be sued under the TVPA." *Id.*

*Clinton v. City of New York*, 524 U.S. 417 (1998), a case cited by the Appellants, does not persuade us to adopt a reading of "individual" in the TVPA to include corporations. In

*Clinton*, the Supreme Court determined that Congress intended the term "individual" in the Line Item Veto Act to be synonymous with "person," including juridical persons such as corporations and associations. *Id.* at 428. The precise question presented there was whether a corporation could utilize the expedited review provisions of the Act authorizing "any individual adversely affected" to challenge the constitutionality of the line item veto authority given to the President.

Although the Court recognized that the term "individual" in ordinary usage often refers to a single human being while "person" has a broader meaning, *id.* at 428 n.13, it nevertheless concluded there was "no plausible reason why Congress would have intended to provide for such special treatment of actions filed by natural persons and to have precluded entirely jurisdiction over comparable cases brought by corporate persons," *id.* at 429. Simply put, according to the Court, "[a]cceptance of the Government's [reading of the Act] 'would produce an absurd and unjust result which Congress could not have intended.' " *Id.* (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 574 (1982)). We find the holding in *Clinton* easily distinguishable, as our interpretation of the TVPA—far from absurd, unjust, or lacking plausible reason—provides a rational and consistent limitation to the TVPA's reach.

Accordingly, we affirm the judgment of the district court dismissing the Appellants' claims under the TVPA.

IV.

We turn next to the dismissal of the Appellants' ATS claims and again review the district court's holding de novo. The district court assumed that the Appellants stated viable ATS claims against the Republic of Iraq, based on international norms that prohibit the development, manufacture, stockpiling, and use of chemical weapons. The Appellants, however, do not assert that Alcolac directly engaged in these

acts, but rather that it aided and abetted Iraq in committing them. The gravamen of the Appellants' ATS claims is that Alcolac sold quantities of Kromfax to NuKraft with actual or constructive knowledge that such quantities would ultimately be used by Iraq in the manufacture of mustard gas to attack the Kurds.

As it did before the district court, Alcolac contends here that the ATS bars the Appellants from seeking relief on an aiding and abetting theory because such a claim is not recognized under international law. Alternatively, Alcolac contends that the Appellants do not allege facts sufficient to show that Alcolac acted with the purpose of facilitating genocide against the Kurds, which Alcolac asserts is an element of the claim.[6] The Appellants urge that the ATS imposes liability for violations of international law on principals as well as aiders and abettors. The Appellants argue further that ATS aiding and abetting claims do not require a showing of purpose, but that their allegations in the Amended Complaint met that standard in any event.

The district court assumed the viability of an aiding and abetting claim under international law, but agreed with Alcolac that the Appellants had failed to allege the requisite mens rea to make out their claims under the ATS. We turn now to consider that ruling.

---

[6]On appeal, Alcolac also contends that corporations cannot be sued under the ATS. Alcolac, however, did not press this basis for dismissal in the district court. In the normal course, we do not consider issues raised for the first time on appeal, except in cases where the alleged "error is 'plain' and our refusal to consider it would result in a miscarriage of justice." *Nat'l Wildlife Fed'n v. Hanson*, 859 F.2d 313, 318 (4th Cir. 1988) (quoting *Stewart v. Hall*, 770 F.2d 1267, 1271 (4th Cir. 1985)). Because Alcolac's new argument on appeal does not fall within the limited circumstances we have recognized for excusing waiver, we decline to consider it.

A.

The ATS was passed by the First Congress as part of the Judiciary Act of 1789 and provides in its current form: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350 (2006).[7] The Supreme Court's seminal exposition on the ATS arrived in *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), over two centuries after the statute's initial enactment.

The Court in *Sosa* noted the presence of radically differing historical interpretations of the ATS, stemming from uncertainty as to whether the statute simply vested federal courts with jurisdiction, neither creating nor authorizing judicial recognition of any particular rights of action absent further congressional action, or instead enabled federal courts to hear cognizable claims without further congressional action. The Court ultimately concluded that the ATS is a jurisdictional statute, albeit one that "enable[s] federal courts to hear claims in a very limited category defined by the law of nations and recognized at common law." *Id.* at 712.

Regarding this "very limited category" of claims, the Court found no basis to think that Congress was mindful of any specific examples other than those corresponding to violations recognized by the criminal law of England relating to "violation of safe conducts, infringement of the rights of ambassadors, and piracy." *Id.* at 724. In that regard, the Court held that "courts should require any claim based on the present-day law of nations to rest on a norm of international character

---

[7]The statute has been amended infrequently since its original enactment. In its original form, the statute provided that the district courts "shall also have cognizance, concurrent with the courts of the several States, or the circuit courts, as the case may be, of all causes where an alien sues for a tort only in violation of the law of nations or a treaty of the United States." Judiciary Act of 1789, ch. 20, § 9, 1 Stat. 73.

accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms [the Court had] recognized." *Id.* at 725. Although the Court did not undertake to comprehensively delineate a set of norms, the violation of which would give rise to actionable claims under the ATS, it nonetheless cautioned a "restrained" approach to such an exercise. *Id.* Specifically, the Court stated that although the "door is still ajar" for the recognition of violations of the law of nations, it is "subject to vigilant doorkeeping, and thus open to a narrow class of international norms today." *Id.* at 729.

## B.

The Appellants' specific claim under the ATS is that Alcolac aided and abetted the Iraqi regime's use of mustard gas to attack the Kurds. Accordingly, we first consider whether the ATS permits suits for aiding and abetting a violation of international law and, if so, the requisite mens rea for prosecuting such an action.

Following *Sosa*, the precise question of accessorial liability under the ATS initially vexed lower federal courts. A few refused to recognize it, reasoning that the Supreme Court's decision in *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164 (1994), foreclosed the imposition of aiding and abetting liability in civil cases except where expressly authorized by Congress.[8] *See*, *e.g.*, *Doe v. Exxon Mobil Corp.*, 393 F. Supp. 2d 20, 24 (D.D.C. 2005). More recently, however, the question of whether the ATS recog-

---

[8]In *Central Bank*, the Supreme Court rejected aiding and abetting liability under section 10(b) of the Securities Exchange Act of 1934, finding that such liability should be permitted in civil cases only where Congress expressly authorizes it. The Court held, "[W]hen Congress enacts a statute under which a person may sue and recover damages from a private defendant for the defendant's violation of some statutory norm, there is no general presumption that the plaintiff may also sue aiders and abettors." 511 U.S. at 182.

nizes aiding and abetting liability has become well-settled, as
"[v]irtually every court to address the issue, before and after
*Sosa*, has so held, recognizing secondary liability for viola-
tions of international law since the founding of the Republic."
*Doe VIII v. Exxon Mobil Corp.*, Nos. 09–7125, 09–7127,
09–7134, 09–7135, 2011 WL 2652384, at \*5 (D.C. Cir. July
8, 2011) (citing *The Presbyterian Church of Sudan v. Talis-
man*, 582 F.3d 244, 258-59 (2d Cir. 2009); *Khulumani*, 504
F.3d at 260; *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252,
1258 n.5 (11th Cir. 2009)).

In recognizing aiding and abetting claims under the ATS,
the Second Circuit and the D.C. Circuit both held that *Central
Bank* does not preclude them. *Doe VIII*, 2011 WL 2652384,
at \*11; *Khulumani*, 504 F.3d at 282 (Katzmann, J., concur-
ring). These courts determined that because Congress gave
explicit authority to federal courts to hear claims under the
ATS " 'committed in violation of the law of nations[,]' " the
holding in *Central Bank* was inapposite. *Doe VIII*, 2011 WL
2652384, at \*11 (quoting *Khulumani*, 504 F.3d at 282 (Katz-
mann, J., concurring)) (internal citation and quotation omit-
ted). And although the Eleventh Circuit did not explicitly
address *Central Bank*, it has recognized aiding and abetting
liability under the ATS. *See Sinaltrainal*; 578 F.3d at 1258 n.5
(11th Cir. 2009); *Romero*, 552 F.3d at 1315; *Aldana*, 416 F.3d
at 1247-48. Following the lead of our sister circuits, we con-
clude that "aiding and abetting liability is well established
under the ATS," *Doe VIII*, 2011 WL 2652384, at \*1, and that
*Central Bank* does not foreclose such claims.

We turn next to the parties' competing contentions as to the
applicable mens rea for the claim. Alcolac urges us to uphold
the district court's specific intent mens rea standard, which
the latter derived from the Second Circuit's opinion in *Talis-
man*. The *Talisman* panel, in turn, was persuaded by Judge
Katzmann's concurring opinion in *Khulumani* and adopted his
proposed rule as the law of the circuit. The Second Circuit
held that "a defendant may be held liable under international

law for aiding and abetting the violation of that law by another when the defendant (1) provides practical assistance to the principal which has a substantial effect on the perpetration of the crime, and (2) does so with the purpose of facilitating the commission of that crime." *Talisman*, 582 F.3d at 258 (quoting *Khulumani*, 504 F.3d at 277 (Katzmann, J., concurring)).

In drawing a mens rea standard, Judge Katzmann looked to the Rome Statute, pursuant to which the International Criminal Court was created.[9] The Rome Statute of the International Criminal Court imposes aiding and abetting liability on one who aids and abets the commission of a crime only if he does so "[f]or the purpose of facilitating the commission of such a crime." *Khulumani*, 504 F.3d at 275 (quoting Rome Statute art. 25, July 17, 1998, 2187 U.N.T.S. 90). Judge Katzmann, noting that the Rome Statute "has been signed by 139 countries and ratified by 105, including most of the mature democracies of the world," took it to " 'constitut[e] an authoritative expression of the legal views of a great number of States.' " *Id.* at 276 (quoting Prosecutor v. Furundzija, Case No. IT-95-17/1-T, Trial Chamber Judgment, ¶ 227 (Int'l Crim. Trib. for the Former Yugoslavia Dec. 10, 1998)).

Judge Katzmann acknowledged that there was "some support" for a knowledge standard of aiding and abetting liability in tribunal decisions from the International Criminal Tribunal

---

[9]Recognizing that an international criminal court was the "missing link in the international legal system" to prosecute crimes such as genocide or those of similar gravity, the United Nations General Assembly convened a conference in Rome in June 1998. *Rome Statute of the International Criminal Court—Overview*, UNITED NATIONS, http://untreaty.un.org/cod/icc/general/overview.htm (last visited August 19, 2011). The product of the conference was the Rome Statute, establishing the International Criminal Court to "be a permanent institution . . . hav[ing] the power to exercise its jurisdiction over persons for the most serious crimes of international concern, as referred to in this Statute, and [to] be complementary to national criminal jurisdictions." Rome Statute art. 1.

for the Former Yugoslavia ("ICTY") and the International Criminal Tribunal for Rwanda ("ICTR").**10** *Id.* at 278. Judge Katzmann noted, however, that these decisions "arise out of completely distinct factual contexts and often involve defendants who might have been convicted on alternate theories of liability." *Id.* at 278. Further, he noted that "panels of [the ICTY] occasionally (and consciously) engaged in discussions peripheral to the *ratio decidendi* of a case in order to provide clarification [that] might have some value for the future development of international criminal law." *Id.* (internal citations and quotations omitted). Finally, he noted inconsistencies in the application of a knowledge mens rea standard in certain of the tribunals' prosecutions, citing to one decision that seemed to require that assistance be "specifically directed to assist . . . the perpetration of a certain specific crime." *Id.* at 278 n.15 (citing Prosecutor v. Vasiljevic, Case No. IT-98-32-A, Appeals Chamber Judgment, ¶ 102(i) (Int'l Crim. Trib. for the Former Yugoslavia Feb. 25, 2004)). For all these reasons, Judge Katzmann was "unable to find that liability predicated on the [knowledge] definition of aiding and abetting offered in the decisions of the ICTY and ICTR is sufficiently well-established and universally recognized to trigger jurisdiction for a tort suit under the [ATS]." *Id.* at 279.

The Appellants urge us to reject *Talisman* and instead fol-

---

**10**The ICTY and ICTR are tribunals established by resolutions of the United Nations Security Council. The ICTY is obliged to "prosecut[e] . . . persons responsible for serious violations of international humanitarian law." S.C. Res. 808, ¶ 1, U.N. SCOR, 48th Sess., U.N. Doc. S/RES/808 (Feb. 22, 1993) ("S.C. Res. 808"). Similarly, the ICTR is mandated to "prosecut[e] persons responsible for genocide and other serious violations of international humanitarian law." S.C. Res. 955, ¶ 1, U.N. SCOR, 49th Sess., U.N. Doc. S/RES/955 (Nov. 8, 1994). In establishing these tribunals, the Security Council noted that "all parties are bound to comply with the obligations under international humanitarian law," and that "persons who commit or order the commission of grave breaches of the [Geneva] Conventions are individually responsible in respect of such breaches." S.C. Res. 808.

low the lead of federal courts that have defined the scope of aiding and abetting liability to reach those who provide "knowing assistance that has a substantial effect on the commission of the human rights violation." *Doe VIII*, 2011 WL 2652384, at \*14; *see also Doe I v. Unocal Corp.*, 395 F.3d 932, 951 (9th Cir. 2002), *vacated*, *reh'g en banc granted* 395 F.3d 978 (9th Cir. 2003). In *Doe VIII*, the D.C. Circuit held that "knowledge" embodies the mens rea standard for imposing aiding and abetting liability under the ATS, finding that the decisions of the ICTY and ICTR were in fact more authoritative than the Rome Statute. The court's analysis looked "to customary international law to determine the standard for assessing aiding and abetting liability," because "[c]onsistent with *Sosa*, the question is whether the international community would express definite disapprobation toward aiding and abetting conduct only when based on a particular standard." 2011 WL 2652384, at \*16. The court found that the ICTY and ICTR, as "international tribunals mandated by their charter to apply only customary international law," constituted authoritative sources of that law. *Id.* The D.C. Circuit concluded that prosecutions before those tribunals have declared that "the knowledge standard suffices under customary international law." *Id.*

The D.C. Circuit also rejected the Rome Statute as an authoritative source of the proper mens rea standard after concluding that it "is properly viewed in the nature of a treaty and not as customary international law." *Id.* at \*18. The court specifically cited Article 10 of the Rome Statute, declaring that the Statute "is not to 'be interpreted as limiting or prejudicing in any way existing or developing rules of international law.' " *Id.* The court also reasoned that, as a treaty, the Rome Statute binds only the countries that have ratified it and noted that the United States has not. *Id.* Finally, the court cited an International Criminal Court ("ICC") prosecution in which the ICC recognized that the Rome Statute did not necessarily represent customary international law. *Id.* (citing Prosecutor v. Germain Katanga and Mathieu Ngudjolo Chui, Case No. ICC-

01/14/01/07, Decision on the Confirmation of Charges, ¶¶ 507-08 (Sept. 30, 2008)).

## C.

The district court accepted the Second Circuit's analysis in *Talisman*,[11] concluding that where liability hinges on a theory of aiding and abetting the principal actor, a plaintiff must allege that the defendant acted with the purpose of facilitating the violation of an international norm. Finding that the Amended Complaint failed to plead facts sufficient to establish that Alcolac sold Kromfax to NuKraft with the purpose of facilitating genocide, the district court dismissed the ATS claims.

We are persuaded by the Second Circuit's *Talisman* analysis and adopt it as the law of this circuit. In that regard, we agree that *Sosa* guides courts to international law to determine the standard for imposing accessorial liability, given *Sosa*'s command that courts limit liability to "violations of international law with definite content and acceptance among civilized nations equivalent to the historical paradigms familiar when [the ATS] was enacted." *Talisman*, 582 F.3d at 259 (quoting *Sosa*, 542 U.S. at 732) (internal alterations omitted).

We recall that the ATS confers jurisdiction over "any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. Thus, we must necessarily look to the law of nations to determine the reach of the statute. Our inquiry is complicated, however, by the fact that several sources comprise that law. Indeed, this very phenomenon explains the tension between the conflicting mens rea standards for accessorial liability drawn by our sister circuits.

---

[11]The district court did not have the benefit of the D.C. Circuit's opinion in *Doe VIII*.

For example, Article 38(1) of the Statute of the International Court of Justice ("ICJ"), which is annexed to the Charter of the United Nations, describes the various sources of international law that the ICJ is to apply as its authority:

    a.    international conventions, whether general or particular, establishing rules expressly recognized by the contesting states;

    b.    international custom, as evidence of a general practice accepted as law;

    c.    the general principles of law recognized by civilized nations;

    d.    subject to the provisions of Article 59, judicial decisions and the teachings of the most highly qualified publicists of the various nations, as subsidiary means for the determination of rules of law.

Similarly, section 102 of the Restatement (Third) of Foreign Relations Law lists the sources as follows:

(1) A rule of international law is one that has been accepted as such by the international community of states

    (a)   in the form of customary law;

    (b)   by international agreement; or

    (c)   by derivation from general principles common to the major legal systems of the world.

(2) Customary international law results from a general and consistent practice of states followed by them from a sense of legal obligation.

(3) International agreements create law for the states parties thereto and may lead to the creation of customary international law when such agreements are intended for adherence by states generally and are in fact widely accepted.

(4) General principles common to the major legal systems, even if not incorporated or reflected in customary law or international agreement, may be invoked as supplementary rules of international law where appropriate.

Finally, as the Supreme Court noted in *The Paquete Habana*:

International law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction as often as questions of right depending upon it are duly presented for their determination. For this purpose, where there is no treaty and no controlling executive or legislative act or judicial decision, resort must be had to the customs and usages of civilized nations, and, as evidence of these, to the works of jurists and commentators, who by years of labor, research, and experience have made themselves peculiarly well acquainted with the subjects of which they treat.

175 U.S. 677, 700 (1900).

With this backdrop in mind, we address the D.C. Circuit's conclusion that the Rome Statute is "properly viewed in the nature of a treaty and not as customary international law," *Doe VIII*, 2011 WL 2652384, at *18, the determination upon which it rested its preference for a standard drawn from ICTY and ICTR prosecutions applying customary international law. In this regard, the D.C. Circuit rightly notes that customary international law is not synonymous with the law of nations, but rather that "customary international law is one of the

sources for the law of nations." *Id.* at \*18 n.23. We also believe the court was correct to reject the notions that "customary international law constitutes the entire corpus of international law" and that the court "may not look to guidance from other sources of international law." *Id.*

We part company, however, with the D.C. Circuit's decision to decline to give greater weight to the Rome Statute as the authoritative source on the issue before us. While we agree with the premise that the Rome Statute does not constitute customary international law, we find that its status as a treaty cuts in favor of accepting its mens rea standard as authoritative for purposes of ATS aiding and abetting liability. Again, we are mindful that the Rome Statute "has been signed by 139 countries and ratified by 105, including most of the mature democracies of the world." *Khulumani*, 504 F.3d at 276 (Katzmann, J., concurring). In our view, then, the Rome Statute constitutes a source of the law of nations, and, at that, a source whose mens rea articulation of aiding and abetting liability is more authoritative than that of the ICTY and ICTR tribunals.[12]

That the United States has not ratified the Rome Statute, "for reasons unrelated to any concern over the definition of aiding-and-abetting," *id.* at 276 n.9, does not undermine its

---

[12]In a footnote, the D.C. Circuit highlights an amicus brief filed by David J. Scheffer, who served as U.S. Ambassador-at-Large for War Crimes Issues and head of the U.S. delegation involved in negotiating the Rome Statute. *Doe VIII*, 2011 WL 2652384, at \*18 n.24. In support of its preference for a "knowledge" standard drawn from ICTY/ICTR prosecutions, the court found meaningful Ambassador Scheffer's explanation that the Rome Statute's accessorial liability provisions were reached after years of discussions and were not adopted as an expression of a rule of customary law. We have no quarrel with the view of the *Doe VIII* majority that the Rome Statute does not express a rule of customary international law. We simply find the Rome Statute's mens rea standard for aiding and abetting liability, reached after prolonged negotiations among delegates from over 100 signatory nations, to be a more authoritative barometer of international expression on the subject.

authority here. Although the D.C. Circuit is correct that the Rome Statute is not binding on the United States, *Doe VIII*, 2011 WL 2652384, at \*18, this does not lessen its import as an international treaty and, thus, a primary source of the law of nations.

Granting the Rome Statute preference over customary international law to resolve the issue before us is particularly appropriate given the latter's elusive characteristics. As our colleagues on the Seventh Circuit recently explained, the difficulties in applying customary international law are manifest:

> The determination of what offenses violate customary international law . . . is no simple task. Customary international law is discerned from myriad decisions made in numerous and varied international and domestic arenas. Furthermore, the relevant evidence of customary international law is widely dispersed and generally unfamiliar to lawyers and judges. These difficulties are compounded by the fact that customary international law—as the term itself implies—is created by the general customs and practices of nations and therefore does not stem from any single, definitive, readily-identifiable source. All of these characteristics give the body of customary international law a soft, indeterminate character.

*Flomo v. Firestone Natural Rubber Co., LLC*, 643 F.3d 1013, 1015 (7th Cir. 2011) (quoting *Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 247-48 (2d Cir. 2003)) (internal quotation omitted). The Seventh Circuit also found "disquieting" that "a custom cannot be identified with the same confidence as a provision in a legally authoritative text, such as a statute or a treaty." *Id.* at 1016.

We conclude that adopting the specific intent mens rea standard for accessorial liability explicitly embodied in the Rome Statute hews as closely as possible to the *Sosa* limits

of "requir[ing] any claim based on the present-day law of nations to rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms [the Supreme Court has] recognized." 542 U.S. at 725.[13]

Although we acknowledge that aiding and abetting liability has been imposed in international tribunals for knowing conduct—*see*, *e.g.*, Vasiljevic—we find that "no . . . consensus exists for imposing liability on [those] who *knowingly* (but not purposefully) aid and abet a violation of international law." *Talisman*, 582 F.3d at 259. As a result, we agree with the Second Circuit that a purpose standard alone has gained "the requisite acceptance among civilized nations for application in an action under the ATS." *Id.* (internal citations and quotations omitted).[14]

In sum, keeping in mind the Supreme Court's admonitions in *Sosa* that we should exercise "great caution" before recognizing causes of action for violations of international law, and

---

[13]In *Doe VIII*, the D.C. Circuit noted what it perceived to be an inconsistency in the Rome Statute regarding the relevant mens rea standard. 2011 WL 2652384, at *18. In our view, however, there is no inconsistency. Plainly, where the Statute provides for liability for an individual whose contribution is "intentional" and either "made with the aim of furthering the criminal activity or criminal purpose of the group," or "made in the knowledge of the intention of the group to commit the crime," it does so in the context of defining the elements of conspiratorial liability under Article 25(3)(d). Because aiding and abetting and conspiracy constitute distinct grounds for imposing secondary liability, and the Appellants here plainly allege the former ground in their Amended Complaint, the Rome Statute's explication of a "knowledge" mens rea standard in the context of the latter ground does not inform our analysis.

[14]Although not dispositive, we note that the Supreme Court chose not to disturb the Second Circuit's specific intent analysis when it declined to accept the parties' cross-petitions for writ of certiorari in *Talisman*. *See Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 131 S. Ct. 79 (2010) (denying cert.); *Talisman Energy, Inc. v. Presbyterian Church of Sudan*, 131 S. Ct. 122 (2010) (denying cert.).

that liability should attach only for violations of those international norms that obtain universal acceptance, 542 U.S. at 728, we hold that for liability to attach under the ATS for aiding and abetting a violation of international law, a defendant must provide substantial assistance with the purpose of facilitating the alleged violation.

### D.

Applying that standard here, the Appellants' sole reference to Alcolac's intentional conduct in the Amended Complaint is an allegation that Alcolac placed Kromfax "into the stream of international commerce with the purpose of facilitating the use of said chemicals in the manufacture of chemical weapons to be used, among other things, against the Kurdish population in northern Iraq." J.A. 370 (Am. Compl. ¶ 53). Such a cursory allegation, however, untethered to any supporting facts, constitutes a legal conclusion that neither binds us, *see Robinson v. Am. Honda Motor Co.*, 551 F.3d 218, 222 (4th Cir. 2009), nor is "entitled to the assumption of truth," *Iqbal*, 129 S. Ct. at 1950. Accordingly, we affirm the judgment of the district court as to the Appellants' ATS claims.

### V.

Our decision is not intended to minimize or excuse the horrific acts recounted by the Appellants in their Amended Complaint. Rather, we simply recognize and apply—as we must—the constraints imposed by law as to the scope of relief authorized by the TVPA and the ATS. These constraints compel us to hold that the Appellants have failed to allege viable claims under these statutes. Accordingly, the judgment of the district court is affirmed.

*AFFIRMED*