RAWLINSON, Circuit Judge,
concurring in part and dissenting in part:
I do not object to remanding this case to afford the Plaintiffs an opportunity to further amend their Complaint in an attempt to state a cause of action under the Alien Tort Statute (ATS), as recently interpreted by the United States Supreme Court in Kiobel v. Royal Dutch Petroleum Co., — U.S. —, 133 S.Ct. 1659, 185 L.Ed.2d 671 (2013). I doubt that their effort will be successful in view of their prior candid acknowledgment in their Opening Brief on appeal that “they do not currently possess facts sufficient to support the district court’s standard that Defendants specifically intended the human rights violations at issue in this case....” Nevertheless, because I cannot say with certitude that any attempt to further amend the Complaint would be futile, I voice no objection to a remand on that basis.
We all agree that the practice of engaging in child slave labor is reprehensible, indefensible, and morally abhorrent. Indeed, if that were the issue we were called upon to decide, this would be an easy case. Instead, we must decide who bears legal responsibility for the atrocities inflicted upon these Plaintiffs, forced into slave labor as children. More precisely, we must determine if the named Defendants in this case may be held legally responsible for the injuries alleged by the Plaintiffs.
I also agree that corporations are not per se excluded from liability under the ATS. See Majority Opinion at 1021-22 (adopting the reasoning of our en banc decision in Sarei v. Rio Tinto, PLC, 671 F.3d 736, 747 (9th Cir.2011)), vacated for further consideration in light of Kiobel, — U.S. —, 133 S.Ct. 1995, 185 L.Ed.2d 863 (2013); see also Romero v. Drummond Co. Inc., 552 F.3d 1303, 1315 (11th Cir.2008) (“The text of the Alien Tort Statute provides no express exception for corporations ... ”) (citation omitted).
I.

Mens Rea Requirement of the ATS

Unlike the majority, I would definitely and unequivocally decide that the purpose standard applies to the pleading of aiding and abetting liability under the ATS. In other words, Plaintiffs seeking to assert a claim against Defendants on an aiding and abetting theory of liability must allege sufficient facts to state a plausible claim for relief, ie., that the defendants acted with the purpose[1] of causing the injuries suffered by the Plaintiffs. See Ashcroft v. Iqbal, 556 U.S. 662, 678-79, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (delineating the *1030 pleading standard under Rule 8 of the Federal Rules of Civil Procedure).
I am persuaded to this view in part by the rationale set forth by our sister circuits in the cases of Presbyterian Church of Sudan v. Talisman Energy, Inc., 582 F.3d 244, 259 (2d Cir.2009) and Aziz v. Alcolac, Inc., 658 F.3d 388, 400-01 (4th Cir.2011).
In Talisman, the Second Circuit considered the claims of Sudanese citizens against the government of Sudan and against Talisman, a corporation that allegedly aided and abetted the government of Sudan in its commission of human rights abuses against the Plaintiffs. The Second Circuit expressly relied upon the principles for “imposing accessorial liability under the ATS” previously articulated by the United States Supreme Court in Sosa v. Alvarez-Machain, 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004), the first Supreme Court case interpreting the ATS. See Talisman, 582 F.3d at 248, 255. The Second Circuit referenced the language in Sosa clarifying that the ATS was enacted with an understanding that the number of actionable international law violations would be “modest.” Id. at 255 (quoting Sosa, 542 U.S. at 724, 124 S.Ct. 2739). The Second Circuit also recounted the reasons explicated by the Supreme Court in Sosa for exercising “great caution” before recognizing violations of international law that are not based on international norms recognized in 1789. Id.
In Sosa, the Supreme Court first focused on the need for exercising caution when considering the availability of claims under the ATS, due to the marked difference between the conception of the common law in 1789 when the ATS was enacted, and the conception of the common law in more modern times. See Sosa, 542 U.S. at 725-26, 124 S.Ct. 2739. Prior to the Supreme Court’s decision in Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), the common law was conceived of as a non-preemptive body of general (non-federal) common law. See Curtis Bradley, International Law in the U.S. Legal System, 211 (Oxford University Press, 2013). Today, judicially recognized claims under the ATS would be considered preemptive federal common law, thereby extending the reach of federal law. See id.
Relatedly, the Supreme Court cautioned federal courts to tread lightly when considering whether to further expand the federal law in a manner “of particular importance to foreign relations.” Sosa, 542 U.S. at 726, 124 S.Ct. 2739. Rather than assuming an “aggressive role” in recognizing claims under the ATS, a statute “that remained largely in shadow for much of the prior two centuries,” the Supreme Court suggested looking to guidance from the legislative branch before embarking on “innovative” substantive expansion of the ATS. Id.
Next, the Supreme Court expressed reluctance to create a private right of action in the absence of an express legislative provision addressing private rights of action, particularly when the effect is to render international rules subject to private action, thereby implicating the management of foreign affairs that are generally best left to “the discretion of the Legislative and Executive Branches.” Id. at 727, 124 S.Ct. 2739. The Supreme Court noted that international law “very much” concerns itself with defining permissible limits on the power of sovereign governments over their own citizens, a notion that inherently inspires the utmost trepidation. Id. at 727-28, 124 S.Ct. 2739.
Finally, the Supreme Court recognized that it is “particularly important” that the federal courts lack a legislative “mandate to seek out and define new and debatable violations of the law of nations.” Id. at 728, 124 S.Ct. 2739. For these reasons, *1031 the Supreme Court urged “great caution in adapting the law of nations to private rights.” Id. Indeed, the Supreme Court, in recognition of the potential negative implications of construing the ATS too broadly, construed the ATS as legislation “meant to underwrite litigation of a narrow set of common law actions derived from the law of nations ...” Id. at 721, 124 S.Ct. 2739 (emphasis added). The Supreme Court instructed that judicial power should be exercised to recognize causes of action under the ATS sparingly, “subject to vigilant doorkeeping” by the federal courts. Id. at 729, 124 S.Ct. 2739.
In Talisman, the Second Circuit absorbed the Supreme Court’s repeated emphasis on the “modest” and “narrow” nature of the claims that should be recognized under the ATS, and rejected the Plaintiffs’ argument for a “broad and elastic” principle of aiding and abetting liability under the ATS. 582 F.3d at 255, 259. Rather, in keeping with the “modest” and “narrow” approach described with approval in Sosa, the Second Circuit adopted the purpose standard as the applicable mens rea test for aiding and abetting liability under the ATS. See id. at 259. As the Second Circuit noted, there is no international consensus supporting the imposition of liability on individuals who act with knowledge of the violation of international law, but who harbor no intent or purpose to aid and abet the violation. See id.
In a similar vein, the Fourth Circuit cited “the Supreme Court’s admonitions in Sosa that we should exercise great caution before recognizing causes of action for violations of international law” and agreed with the Second Circuit that aiding and abetting liability under the ATS must be predicated on a showing of purposeful facilitation of the violation of international law. Aziz, 658 F.3d at 401 (internal quotation marks omitted).
I agree with the Second and Fourth Circuits that the principles set forth in Sosa militate in favor of the application of a mens rea of purpose or specific intent to impose aiding and abetting liability under the ATA, and I would so hold.
Applying the proper mens rea standard of purpose, or specific intent, I strongly disagree that the allegations in Plaintiffs’ Amended Complaint satisfy that standard. The contrary conclusion reached by the majority is particularly curious in light of the Plaintiffs’ concession of their inability to meet the standard. Nevertheless, the majority generally relies upon allegations in the Amended Complaint as sufficient to establish that Defendants acted with the purpose to aid and abet child slavery. The majority focuses on inferences rather than on any particular allegations in the Amended Complaint that reflect the purpose mens rea. The only allegation from the Amended Complaint that is specifically referenced is the allegation that “[d]riven by the goal to reduce costs in any way possible, the defendants allegedly supported the use of child labor, the cheapest form of labor available.... ” Majority Opinion at 1024. The majority concludes that “[rjeading the allegations in the light most favorable to the plaintiffs, one is led to the inference that the defendants placed increased revenues before basic human welfare, and intended to pursue all options available to reduce their cost for purchasing cocoa.” Id. at 1024. Piling inference upon inference, the majority contends that the allegations that the defendants placed increased revenues before human welfare and acted with the intent to reduce the cost of purchasing cocoa, “support the inference that the defendants acted with the purpose to facilitate child slavery.” Id. But is that inference plausible, as required *1032 by Iqball I think not, because these allegations are remarkably similar to those rejected by the Supreme Court in Iqbal.
The Plaintiff in Iqbal filed a Bivens[2] action against the Attorney General of the United States and the Director of the Federal Bureau of Investigations, asserting that the defendants violated his constitutional rights by subjecting him to inhumane conditions of confinement due to his race, national origin or religion. See Iqbal, 556 U.S. at 668-69, 129 S.Ct. 1937. Iqbal alleged that the Defendants “knew of, condoned, and willfully and maliciously agreed to subject [Iqbal] to harsh conditions of confinement as a matter of policy, solely on account of [Iqbal’s] religion, race, and/or national origin ...” Id. at 680, 129 S.Ct. 1937 (internal quotation marks omitted). The Supreme Court rejected this allegation as a “bare assertion [ ], amounting] to nothing more than a formulaic recitation of the elements of a constitutional discrimination claim ...” Id. at 681, 129 S.Ct. 1937 (citation and internal quotation marks omitted). The Supreme Court added that the allegation was “conclusory” and “disentitle^] ... to the presumption of truth.” Id.
The same can be easily said of the one specific allegation relied on by the majority in this case. The allegation that Defendants acted with the intent “to reduce costs in any way possible” is at best a feeble attempt to set forth the required mens rea of purpose, or specific intent. However, as the Supreme Court noted in Iqbal, a conclusory statement of the elements of a claim falls far short of stating a plausible claim. See id.
The statement that child slavery is the cheapest form of labor available does not even implicate the Defendants. This allegation in no way raises a plausible inference that the Defendants acted with the purpose to aid and abet child slave labor. It may well be true that child slave labor is the cheapest form of labor for harvesting cocoa. But that unvarnished statement in no way supports the inferential leap that because child slave labor is the cheapest form of labor, Defendants aided and abetted the cocoa farmers who allegedly operated the child slave labor system.
To bolster the inferences discussed, the majority explains that Defendants’ “use of child slavery benefitted the defendants and furthered their operational goals in the Ivory Coast ...” Majority Opinion at 1024. However, taking advantage of a favorable existing market, while perhaps morally repugnant, does not equate to the specific intent to aid and abet child slave labor. In Aziz, 658 F.3d at 390-91, the corporate defendant sold restricted chemicals that ultimately reached Iraq and were used to manufacture mustard gas. The mustard gas in turn was used to attack Kurds. Thousands of Kurds were killed, maimed, or left with “physical and psychological trauma.” Id. at 391. Plaintiffs, individuals of Kurdish descent, were victims of mustard gas attacks themselves, or family members of deceased victims. They brought claims under the ATS, alleging that the corporate defendant “aided and abetted the Iraqi regime’s use of mustard gas to attack the Kurds.... ” Id. at 395. Plaintiffs specifically alleged that the corporate defendant “placed [the restricted chemicals] into the stream of international commerce with the purpose of facilitating the use of said chemicals in the manufacture of chemical weapons to be used, among other things, against the Kurdish *1033 population in northern Iraq.” Id. at 401 (citation omitted). Citing Iqbal, the Fourth Circuit characterized the allegations as “cursory” and “untethered to any supporting facts.” Id. Unfortunately, that same characterization accurately describes the allegations made by Plaintiffs in this case.
The aiding and abetting claims asserted under the ATS in Talisman met a similar fate in the Second Circuit. Plaintiffs alleged that Talisman, a corporation, provided “substantial assistance” to the government of Sudan, which assistance aided the government in “committing crimes against humanity and war crimes ...” 582 F.3d at 261. The assistance provided by Talisman to the government included: 1) upgrading airstrips; 2) designating areas for oil exploration; 3) paying royalties to the government; and “giving general logistical support to the Sudanese military....” Id. (citation and footnote reference omitted). The Second Circuit observed that there was nothing inherently nefarious about these activities. Rather, such activities “generally accompany any natural resource development business or the creation of any industry....” Id. (citation omitted). In essence, Plaintiffs argued that Talisman should have made no financial investment in Sudan at all, lest the resulting financial wherewithal enable the government to victimize its citizenry. However, as in Aziz, the allegations were insufficient to support a plausible inference that Talisman acted with the required mens rea of purpose or specific intent. See id. at 263; see also Aziz, 658 F.3d at 401.
The majority seeks to distinguish Aziz and Talisman, but no principled distinction can be made. The majority points to the fact that Defendants in this case had sufficient control over the cocoa market “that they could have stopped or limited the use of child slave labor by their suppliers.” Majority Opinion at 1025. Rather than doing so, the majority concludes, Defendants “instead offered support that facilitated” child slavery. Id. at 1025. This reasoning mirrors the argument rejected by the Second Circuit that Talisman should never have made a financial investment in Sudan, thereby enabling that country to oppress its people. See Talisman, 582 F.3d at 262-63. Rejection of this argument is particularly appropriate in the absence of evidence that Defendants intended that the financial support be used to facilitate child slavery. See id. at 262.
The majority also points to Defendants’ lobbying efforts to “corroborate the inference of purpose.” Majority Opinion at 1025. “[T]he defendants participated in lobbying efforts designed to defeat federal legislation that would have required chocolate importers and manufacturers to certify and label their chocolate as slave free.” Id. at 1025 (internal quotation marks omitted). In the alternative, Defendants and others with interests in the chocolate industry advocated for the implementation of a voluntary compliance mechanism. See id. However, exercising their right to petition the government does not reasonably support an inference that Defendants acted with the purpose to aid and abet child slavery. It is equally likely that Defendants sought to avoid additional government regulation. As recognized by the Second Circuit, if there is a benign explanation for the corporation’s action, no plausible inference of purpose may be drawn. See Talisman, 582 F.3d at 262.
Plaintiffs and the majority concede that any and all actions taken by Defendants were motivated by the desire for profits rather than an intent to enslave children. See Majority Opinion at 1024-25. This concession is fatal to the Amended Complaint as presently couched. There is ab *1034 solutely no allegation that Defendants have violated any governing law or regulation in their quest for profits. And profit-seeking is the reason most corporations exist. To equate a profit-making motive with the mens rea required for ATS aiding and abetting liability would completely negate the constrained concept of ATS liability contemplated by the Supreme Court in Sosa. See 542 U.S. at 721, 724, 729, 124 S.Ct. 2739 (construing the ATS as encompassing a “modest” and “narrow” set of claims “subject to vigilant doorkeeping by the federal courts”) (internal quotation marks omitted).
One would hope that corporations would operate their businesses in a humanitarian and morally responsible manner. It is indeed unfortunate that many neglect to do so. However regrettable that circumstance may be, we cannot substitute the lack of humanitarianism for the pleading requirements that govern the ATS. Following the reasoning of Sosa, Aziz and Talisman, I would not conclude that the Plaintiffs have stated a claim under the ATS.
II.

Extraterritorial Reach of the ATS

As stated earlier, I do not object to a remand to allow Plaintiffs to seek to further amend their Complaint in light of the Supreme Court’s recent Kiobel decision. However, in my view, Plaintiffs face a substantial hurdle in their effort to assert a viable claim that the ATS applies to the admittedly extraterritorial child slave labor that is the basis of this case. As noted by the majority, Justice Kennedy observed that the Kiobel opinion left open “a number of significant questions regarding the reach and interpretation of the Alien Tort Statute.... ” Kiobel, 133 S.Ct. at 1669 (Kennedy, J. concurring). But a question not left open regarding the reach of the ATS was the presumption against extraterritorial application of the statute. See id. at 1664-67.
In Kiobel, Plaintiffs sued corporate defendants who participated in oil exploration and production in Nigeria. In their Complaint, Plaintiffs alleged that after they protested against the environmental effects of the corporation’s practices, “Nigerian military and police forces attacked ... villages, beating, raping, killing, and arresting residents and destroying or looting property.” Id. at 1662. According to Plaintiffs, the corporate defendants aided and abetted their tormentors “by, among other things, providing the Nigerian forces with food, transportation and compensation, as well as by allowing the Nigerian military to use respondents’ property as a staging ground for attacks.” Id. at 1662-63.
The Supreme Court explained that the presumption against extraterritorial application of federal statutes avoids “unintended clashes between our laws and those of other nations which could result in international discord.” Id. at 1664 (citation omitted). The Supreme Court noted that the concern underlying the presumption is heightened in cases brought under the ATS because those cases seek relief based on court-created causes of action rather than for claims expressly provided for by Congress. See id. Referring back to Sosa, the Supreme Court reiterated its emphasis on “the need for judicial caution in considering which claims could be brought under the ATS ...” Id. Indeed, the foreign policy implications of recognizing a claim under the ATS “are all the more pressing when the question is whether a cause of action under the ATS reaches conduct within the territory of another sovereign.” Id. at 1665.
The Supreme Court observed that “nothing in the text of the [ATS] suggests that Congress intended causes of action *1035 recognized under it to have extraterritorial reach.... ” Id. Similarly, nothing in the historical backdrop of the statute overcomes the presumption against extraterritorial application of the ATS. See id. at 1666. Finally, the Supreme Court emphasized that there was no indication that Congress intended to make this country the forum “for the enforcement of international norms....” Id. at 1668.
Having articulated these underlying precepts, the Supreme Court concluded that the ATS was subject to the presumption against extraterritorial application and that Plaintiffs’ “case seeking relief for violations of the law of nations occurring outside the United States [was] barred ...” Id. at 1669. On the facts as alleged by Plaintiffs, “all the relevant conduct took place outside the United States.” Id. (emphasis added). The Supreme Court further explained that even in a case where the claims did “touch and concern the territory of the United States, they must do so with sufficient force to displace the presumption against extraterritorial application....” Id. (citing Morrison v. Nat’l Australia Bank Ltd., 561 U.S. 247, 264-73, 130 S.Ct. 2869, 177 L.Ed.2d 535 (2010)).
In Morrison, the Supreme Court held, in no uncertain terms, that when an allegation of domestic relationship is raised to defeat the presumption against extraterritoriality, that domestic relationship must coincide with “the focus of congressional concern ...” Id. at 266, 130 S.Ct. 2869 (citation omitted). I do not agree with the majority that the Supreme Court “did not incorporate Morrison’s focus test.” Majority Opinion at 1028. Why else would the Supreme Court direct us to Morrison precisely when it was discussing claims that allegedly “touch and concern” the United States? Kiobel, 133 S.Ct. at 1669. In any event, at a minimum, the Supreme Court has made clear that not any old domestic contact will do. Rather, the Supreme Court has colorfully informed us that the burden of showing sufficient domestic contact is substantial. See Morrison, 561 U.S. at 266, 130 S.Ct. 2869 (“[T]he presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever some domestic activity is involved in the case....”) (emphasis in the original).
In sum, I would affirm the district court’s ruling that the Amended Complaint failed to state a claim under the ATS. In reviewing the next amended Complaint, the district court should hew closely to the guidance that the Supreme Court laid out in Morrison, Sosa and Kiobel that cautions federal court judges to tread lightly both when determining whether a claim has been stated under the ATS and whether the presumption against extraterritorial application of a domestic statute has been rebutted. These cases militate toward contraction rather than expansion. Therefore, I concur in a remand to allow Plaintiffs to further amend their Complaint in an effort to state a claim under the ATS. I dissent from any holding that they have adequately done so.

. I use the term "purpose” interchangeably with the phrase “specific intent” because there is no material difference between the two. See United States v. Gracidas-Ulibarry, 231 F.3d 1188, 1196 (9th Cir.2000) ("In general, purpose’ corresponds to the concept of specific intent ... ”) (citations omitted); see also United States v. Meredith, 685 F.3d 814, 826 (9th Cir.2012) ("Jury Instruction 52 defines willfully as an act done voluntarily and intentionally and with the specific intent to do something the law forbids; that is to say with a purpose either to disobey or disregard the law....”) (internal quotation marks omitted).

. Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).