**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| JOHN DOE I; JOHN DOE II; JOHN DOE III, individually and on behalf of proposed class members; GLOBAL EXCHANGE, *Plaintiffs-Appellants*,<br><br>v.<br><br>NESTLE USA, INC.; ARCHER DANIELS MIDLAND COMPANY; CARGILL INCORPORATED COMPANY; CARGILL COCOA, *Defendants-Appellees*. | No. 10-56739<br><br>D.C. No. 2:05-CV-05133-SVW-JTL<br><br>ORDER AND OPINION |

Appeal from the United States District Court
for the Central District of California
Stephen V. Wilson, District Judge, Presiding

Argued and Submitted
December 2, 2013—Pasadena, California

Filed September 4, 2014

Before: Dorothy W. Nelson, Kim McLane Wardlaw,
and Johnnie B. Rawlinson, Circuit Judges.

Order;
Opinion by Judge D.W. Nelson;
Partial Concurrence and Partial Dissent by Judge
Rawlinson

# SUMMARY[*]

## Alien Tort Statute

The panel withdrew its order filed December 19, 2013, and appearing at 738 F.3d 1048, and replaced the order with an opinion reversing and vacating the district court's dismissal of an action under the Alien Tort Statute.

The action was brought by former child slaves who were forced to harvest cocoa in the Ivory Coast. They alleged that the defendant corporations aided and abetted child slavery by providing assistance to Ivorian farmers.

Reaffirming the corporate liability analysis reached by an en banc court in *Sarei v. Rio Tinto, PLC*, 671 F.3d 736 (9th Cir. 2011), *vacated on other grounds by* 133 S. Ct. 1995 (2013), the panel held that there is no categorical rule of corporate immunity or liability. Rather, for each ATS claim asserted by the plaintiffs, a court should look to international law and determine whether corporations are subject to the norms underlying that claim. The panel held that the prohibition against slavery was universal and could be asserted against the corporate defendants in this case. The panel held that determining when a corporation can be held liable requires a court to apply customary international law to determine the nature and scope of the norm underlying the plaintiffs' claim, and domestic tort law to determine whether recovery from the corporation is permissible. The panel left

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

domestic law issues related to corporate liability to be addressed by the district court in the first instance.

The panel next addressed the issue whether the complaint alleged the elements of a claim for aiding and abetting slavery. Applying customary international law, the panel declined to decide whether the required *mens rea* was knowledge, or whether an ATS defendant must act with the purpose of facilitating the criminal act. The panel concluded that the plaintiffs' allegations satisfied the more stringent "purpose" standard by suggesting that a myopic focus on profit over human welfare drove the defendants to act with the purpose of obtaining the cheapest cocoa possible, even if it meant facilitating child slavery.

The panel held that the *actus reus* of aiding and abetting was providing assistance or other forms of support to the commission of a crime, and that international law further required that the assistance offered must be substantial. The panel declined to decide whether the assistance must also be specifically directed towards the commission of the crime. Instead, it remanded to the district court with instructions to allow the plaintiffs to amend their complaint in light of recent decisions of international criminal tribunals addressing the "specific direction" requirement.

The panel also declined to decide whether the plaintiffs' ATS claim sought an extraterritorial application of federal law that was barred by the Supreme Court's recent decision in *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013). The panel remanded to allow the plaintiffs to amend their complaint in light of *Kiobel*.

Concurring in part and dissenting in part, Judge Rawlinson wrote that she did not object to remanding to allow the plaintiffs to further amend their complaint in an attempt to state a cause of action under the ATS, as recently interpreted by the Supreme Court in *Kiobel*. She also agreed that corporations are not per se excluded from liability under the ATS. Unlike the majority, Judge Rawlinson, agreeing with the Second and Fourth Circuits, would definitely and unequivocally decide that the purpose standard applies to the pleading of aiding and abetting liability under the ATS. She dissented from any holding that the plaintiffs had adequately stated a claim under the ATS.

## COUNSEL

Paul Hoffman (argued), Schonbrun DeSimone Seplow Harris Hoffman & Harrison, LLP, Venice, California; Terrence Patrick Collingsworth, Conrad & Scherer, LLP, Washington, D.C., for Plaintiff-Appellants.

Andrew John Pincus (argued), Mayer Brown LLP, Washington, DC; Craig A. Hoover and Christopher Todd Handman, Hogan Lovells US LLP, Washington, D.C.; Julie A. Shepard, Jenner & Block, LLP, Los Angeles, California; Jonathan H. Blavin and Kristin Linsley Myles, Munger Tolles & Olson, LLP, San Francisco, California; Brad D. Brian and Daniel Paul Collins, Munger Tolles & Olson, LLP, Los Angeles, California; Lee H. Rubin, Mayer Brown LLP, Palo Alto, California, for Defendants-Appellees.

Susan Hannah Farbstein, International Human Rights Clinic, Harvard Law School, Cambridge, Massachusetts, for Amicus Curiae Professors of Legal History.

Marco Simons, Earthrights International, Washington, D.C., for Amicus Curiae Earthrights International.

Jennifer M. Green, Director, Human Rights Litigation and International Advocacy Clinic University of Minnesota Law School, Minneapolis, Minnesota, for Amici Curiae Nuremberg Scholars.

David J. Scheffer, Northwestern University School of Law Bluhm Legal Clinic, Center for International Human Rights, Chicago, Illinois, for Amicus Curiae David J. Scheffer.

Peter Bowman Rutledge, Athens, Georgia, for Amici Curiae Chamber of Commerce of the United States of America and the National Foreign Trade Council.

Meir Feder, Jones Day, New York, New York, for Amici Curiae National Association of Manufacturers and Professors of International and Foreign Relations Law and Federal Jurisdiction.

James Evan Berger and Charlene Sun, King & Spalding, LLP, New York, New York; Rebecca Kelder Myers, Vandenberg & Feliu LLP, New York, New York; Todd Tyler Williams, Paul Hastings LLP, New York, New York, for Amicus Curiae United States Council for International Business.

William Aceves, California Western School of Law, San Diego, California, for Amicus Curiae International Law Scholars.

Jonathan Massey, Massey & Gail LLP, Washington, D.C., for Amicus Curiae Nuremberg Historians and International Lawyers.

## ORDER

The order filed December 19, 2013, and appearing at 738 F.3d 1048, is withdrawn, *Carver v. Lehman*, 558 F.3d 869, 878–79 (9th Cir. 2009), and is replaced by the opinion filed concurrently with this order. Our prior order may not be cited as precedent to any court. Moreover, with the original order withdrawn, we deem the petition for rehearing and rehearing en banc moot. The parties may file a petition for rehearing and rehearing en banc with respect to the opinion filed together with this order.

**IT IS SO ORDERED.**

## OPINION

D.W. NELSON, Senior Circuit Judge:

The plaintiffs in this case are former child slaves who were forced to harvest cocoa in the Ivory Coast. They filed claims under the Alien Tort Statute (ATS) against defendants Nestle USA, Inc., Archer Daniels Midland Company, Cargill Incorporated Company, and Cargill Cocoa, alleging that the defendants aided and abetted child slavery by providing assistance to Ivorian farmers.

The district court dismissed their complaint, finding that the plaintiffs failed to state a claim upon which relief can be granted. We reverse, vacate, and remand for further proceedings.

## I. Background[1]

The use of child slave labor in the Ivory Coast is a humanitarian tragedy. Studies by International Labour Organization, UNICEF, the Department of State, and numerous other organizations have confirmed that thousands of children are forced to work without pay in the Ivorian economy. Besides the obvious moral implications, this widespread use of child slavery contributes to poverty in the Ivory Coast, degrades its victims by treating them as commodities, and causes long-term mental and physical trauma.

The plaintiffs in this case are three victims of child slavery. They were forced to work on Ivorian cocoa plantations for up to fourteen hours per day six days a week, given only scraps of food to eat, and whipped and beaten by overseers. They were locked in small rooms at night and not permitted to leave the plantations, knowing that children who tried to escape would be beaten or tortured. Plaintiff John Doe II witnessed guards cut open the feet of children who attempted to escape, and John Doe III knew that the guards forced failed escapees to drink urine.

---

[1] The facts set forth in our background section are drawn from the allegations in the plaintiffs' First Amended Complaint, which we must accept as true for purposes of evaluating a motion to dismiss. *Seven Arts Filmed Entm't Ltd. v. Content Media Corp. PLC*, 733 F.3d 1251, 1254 (9th Cir. 2013).

Though tarnished by these atrocities, the Ivory Coast remains a critical part of the international chocolate industry, producing seventy percent of the world's supply of cocoa. The defendants in this case dominate the Ivorian cocoa market. Although the defendants do not own cocoa farms themselves, they maintain and protect a steady supply of cocoa by forming exclusive buyer/seller relationships with Ivorian farms. The defendants are largely in charge of the work of buying and selling cocoa, and import most of the Ivory Coast's cocoa harvest into the United States. The defendants' involvement in the cocoa market gives them economic leverage, and along with other large multinational companies, the defendants effectively control the production of Ivorian cocoa.

To maintain their relationships with Ivorian farms, the defendants offer both financial assistance and technical farming assistance designed to support cocoa agriculture. The financial assistance includes advanced payment for cocoa and spending money for the farmers' personal use. The technical support includes equipment and training in growing techniques, fermentation techniques, farm maintenance, and appropriate labor practices. The technical support is meant to expand the farms' capacity and act as a quality control mechanism, and either the defendants or their agents visit farms several times per year as part of the defendants' training and quality control efforts.

The defendants are well aware of the child slavery problem in the Ivory Coast. They acquired this knowledge firsthand through their numerous visits to Ivorian farms. Additionally, the defendants knew of the child slave labor problems in the Ivorian cocoa sector due to the many reports issued by domestic and international organizations.

Despite their knowledge of child slavery and their control over the cocoa market, the defendants operate in the Ivory Coast "with the unilateral goal of finding the cheapest sources of cocoa." The defendants continue to supply money, equipment, and training to Ivorian farmers, knowing that these provisions will facilitate the use of forced child labor. The defendants have also lobbied against congressional efforts to curb the use of child slave labor. In 2001, the House of Representatives passed a bill that would have required United States importers and manufacturers to certify and label their products "slave free." The defendants and others in the chocolate industry rallied against the bill, urging instead the adoption of a private, voluntary enforcement mechanism. A voluntary enforcement system was eventually adopted, a result that, according to the plaintiffs, "in effect guarantee[d] the continued use of the cheapest labor available to produce [cocoa]—that of child slaves."

The plaintiffs filed a proposed class action in the United States District Court for the Central District of California, alleging that the defendants were liable under the ATS for aiding and abetting child slavery in the Ivory Coast. The district court granted the defendants' motion to dismiss in a detailed opinion, which concluded that corporations cannot be sued under the ATS, and that even if they could, the plaintiffs failed to allege the elements of a claim for aiding and abetting slave labor. The plaintiffs declined to amend their complaint, and appeal the district court's order.

## II. Standard of Review

"A dismissal for failure to state a claim is reviewed de novo. All factual allegations in the complaint are accepted as true, and the pleadings construed in the light most favorable

to the nonmoving party." *Abagnin v. AMVAC Chemical Corp.*, 545 F.3d 733, 737 (9th Cir. 2008) (internal citations omitted).

## III. Discussion

The ATS, quoted in full, reads:

> The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.

28 U.S.C. § 1350. For nearly two hundred years, the ATS was almost never invoked. In *Filartiga v. Pena-Irala*, however, the Second Circuit breathed life into the statute by construing it to allow two Paraguayan citizens to bring a civil action against a Paraguayan police officer who had tortured and killed their son. 630 F.2d 876, 878 (2d Cir. 1980); *Sosa v. Alvarez-Machain*, 542 U.S. 692, 724–25 (2004) (describing *Filartiga* as "the birth of the modern line of [ATS] cases."). The Second Circuit in *Filartiga* reasoned that the ATS was designed to "open[] the federal courts for adjudication of the rights already recognized by international law," and thus permitted the plaintiffs to pursue their tort claim because torture is prohibited by international law. *Filartiga*, 630 F.2d at 885, 887–88. *Filartiga* concluded by observing that modern history had led the nations of the world to recognize the collective interest in protecting fundamental human rights, and commented that its holding was "a small but important step in the fulfillment of the ageless dream to free all people from brutal violence." *Id.* at 890.

The Supreme Court reached a consonant result in *Sosa v. Alvarez-Machain*, its first opinion addressing the ATS. The Court first held that the text of the ATS is focused solely on jurisdiction, and that the statute itself does not create a tort cause of action arising out of violations of international law. *Sosa*, 542 U.S. at 724. After reviewing the ATS's history, however, the Court also observed that "the statute was intended to have practical effect the moment it became law," and thus held that "[t]he jurisdictional grant is best read as having been enacted on the understanding that the common law would provide a cause of action for the modest number of international law violations with a potential for personal liability at the time." *Id.* Thus, under *Sosa*, the federal courts are available to hear tort claims based on violations of international law. Specifically, *Sosa* held that federal common law creates tort liability for violations of international legal norms, and the ATS in turn provides federal courts with jurisdiction to hear these hybrid common law–international law tort claims. *Id.*; *Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254, 265 (2d. Cir. 2007) (Katzmann, J., concurring) ("*Sosa* makes clear that all [ATS] litigation is in fact based on federal common law. . . .").

At the time of its passage, the ATS was intended to grant jurisdiction over tort claims seeking relief only for three violations of international law: piracy, violation of safe conducts, and infringement of the rights of ambassadors. *Sosa*, 542 U.S. at 724. The Court in *Sosa* held, however, that contemporary ATS claims can invoke the rights created by the "present-day law of nations," and thus are not limited to these "historical paradigms." *Id.* at 725, 732. Under contemporary international law, federal courts have permitted plaintiffs to pursue ATS claims based on a broad range of

misconduct, including genocide, war crimes, torture, and supporting terrorism.

While *Sosa* therefore permits the application of contemporary international law in an ATS claim, federal courts must exercise restraint when doing so. *Sosa* described this restraint through a historically focused standard for determining when an ATS claim may be based on contemporary international law. Under this test, "federal courts should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when § 1350 was enacted." *Id.* at 732. This standard "is suggestive rather than precise," and is perhaps "best understood as the statement of a mood—and the mood is one of caution." *Flomo v. Firestone Natural Rubber Co., LLC*, 643 F.3d 1013, 1016 (7th Cir. 2011). Applying this standard, courts focus on whether a contemporary international legal norm underlying a proposed ATS claim is "specific, universal, and obligatory." *In re Estate of Marcos Human Rights Litig.*, 25 F.3d 1467, 1475 (9th Cir. 1994); *Sosa*, 542 U.S. at 732 (citing this definition with approval).

Additionally, *Sosa* held that the decision to recognize a new cause of action must "involve an element of judgment about the practical consequences of making that cause available to litigants in the federal courts." *Sosa*, 542 U.S. at 732–33. This inquiry focuses on "the consequences that might result from making the cause of action generally available to all potential plaintiffs," and permits courts "to consider other prudential concerns consistent with *Sosa*'s approach." *Khulumani*, 504 F.3d at 268 (Katzmann, J., concurring).

The body of international law that supplies the norms underlying an ATS claim is often referred to as "customary international law," which consists of "rules that States universally abide by, or accede to, out of a sense of legal obligation and mutual concern." *Id.* at 267 (Katzmann, J., concurring) (quoting *Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 248 (2d Cir. 2003)); *see also The Paquete Habana*, 175 U.S. 677, 707–08 (1900); *Abagninin*, 545 F.3d at 738. To determine the content of customary international law, courts "look to the sources of law identified by the Statute of the International Court of Justice." *Khulumani*, 504 F.3d at 267 (Katzmann, J., concurring). These sources include international conventions, international customs, "the general principles of law recognized by civilized nations," "judicial decisions," and the works of scholars. *Id.*; *see also* Restatement (Third) of Foreign Relations Law § 102 (1987) (identifying similar sources). Courts also consult authorities that provide an authoritative expression of the views of the international community even if, strictly speaking, the authority is not meant to reflect customary international law. *Khulumani*, 504 F.3d at 267 (Katzmann, J., concurring) (relying on the Rome State of the International Criminal Court).

Here, the parties look primarily to three sources of customary international law. The first are decisions of the post–World War II International Military Tribunal at Nuremberg, which are widely recognized as a critical part of customary international law and regularly invoked in ATS litigation. *See*, e.g., *Khulumani*, 504 F.3d at 271 (Katzmann, J., concurring). The second are decisions issued by the International Criminal Tribunals for Rwanda and the former Yugoslavia (ICTR and ICTY, respectively), which were convened to prosecute violations of international

humanitarian law committed in Rwanda during 1994 and war crimes that took place in the Balkans during the 1990s. These decisions are also recognized as authoritative sources of customary international law. *Id.* at 278–79; *Abagninin*, 545 F.3d at 739. The third is a recent decision issued by the Special Court for Sierra Leone (SCSL), which was convened to address violations of international humanitarian law in Sierra Leone since November 30, 1996. *Prosecutor v. Taylor*, Case No. SCSL-03-01-A (SCSL Sept. 26, 2013). We consider this decision to be a proper source of international law for ATS claims. The parties also cite the Rome Statute of the International Criminal Court in their briefing, but, as discussed in more detail below, dispute its relevance in this case.

The specific norms underlying the plaintiffs' ATS claim are the norms against aiding and abetting slave labor, which the defendants allegedly violated by providing financial and non-financial assistance to cocoa farmers in the Ivory Coast. The defendants argue that this claim should be dismissed, for three reasons. First, the defendants argue that there is no specific, universal, and obligatory norm preventing corporations—as opposed to individuals—from aiding and abetting slave labor. Second, the defendants argue that the plaintiffs' complaint fails to allege the *actus reus* and *mens rea* elements of an aiding and abetting claim. Finally, the defendants argue that the plaintiffs' complaint improperly seeks extraterritorial application of federal law contrary to the Supreme Court's recent decision in *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013) ("*Kiobel II*"). We consider each argument in turn.

## A. Corporate Liability under the ATS

The primary focus of international law, although not its exclusive focus, is the conduct of states. *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 165 (2d. Cir. 2010) (Leval, J., concurring) ("*Kiobel I*"). Many of its prohibitions therefore only apply to state action, and an important issue in ATS litigation can be determining whether the norm asserted by the plaintiff is applicable to both state actors and private actors. This issue is illustrated by the contrasting decisions of the D.C. Circuit in *Tel-Oren v. Libyan Arab Republic* and the Second Circuit in *Kadic v. Karadzic*. In *Tel-Oren*, Judge Edwards concluded that the plaintiffs' ATS claim was barred because there was no consensus that international law applied to torture carried out by non-state actors. 726 F.2d 774, 791–95 (D.C. Cir. 1984). In *Kadic*, by contrast, the Second Circuit held that international law's prohibition on genocide applies regardless of whether the perpetrator is acting on behalf of a state. 70 F.3d 232, 241–42 (2d. Cir. 1995).

The Supreme Court's only allusion to corporate liability occurred in a footnote that referenced these discussions in *Tel-Oren* and *Kadic*. *Sosa*, 542 U.S. at 732 n.20. In the footnote, the Court directed federal courts contemplating the recognition of new ATS claims to consider "whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a *private actor such as a corporation or individual*." *Id.* (emphasis added).

The issue of corporate liability has been more thoroughly examined in the circuit courts, which have disagreed about whether and under what circumstances corporations can face liability for ATS claims. *Kiobel I*, 621 F.3d at 145; *Doe v.*

*Exxon Mobil Corp.*, 654 F.3d 11, 57 (D.C. Cir. 2011), *vacated on other grounds by* 527 F. App'x. 7 (D.C. Cir. 2013); *Sarei v. Rio Tinto, PLC*, 671 F.3d 736, 747 (9th Cir. 2011) *vacated on other grounds by* 133 S. Ct. 1995 (2013); *Flomo*, 643 F.3d at 1020–21. Here, we reaffirm the corporate liability analysis reached by the en banc panel of our circuit in *Sarei v. Rio Tinto.*

In *Sarei*, the plaintiffs sought to hold corporate defendants liable for aiding and abetting genocide and war crimes. We first rejected the defendants' argument that corporations can never be sued under the ATS. Rather than adopting a blanket rule of immunity or liability, the *Sarei* court held that for each ATS claim asserted by the plaintiffs, a court should look to international law and determine whether corporations are subject to the norms underlying that claim. *Id.* at 748 ("*Sosa* expressly frames the relevant international-law inquiry to be the scope of liability of private actors for a violation of the 'given norm,' i.e. an international-law inquiry specific to each cause of action asserted."). Thus, we adopted a norm-by-norm analysis of corporate liability.

The *Sarei* court then conducted corporate liability analyses for the two norms underlying the plaintiffs' claims, the norm against genocide and the norm against war crimes. *Id.* at 759–61, 764–65. The en banc panel observed that both norms apply to states, individuals, and groups, and that the applicability of the norms turns on the "specific identity of the *victims* rather than the identity of the *perpetrators*." *Id.* at 760, 764–65 (emphasis added). Thus, we concluded that the norms were "universal" or applicable to "all actors," and, consequently, applicable to corporations. *Id.* at 760, 765. We reasoned that allowing an actor to "avoid liability merely by

incorporating" would be inconsistent with the universal quality of these norms. *See id.* at 760 (discussing genocide).

In *Sarei* we also explained that a norm could form the basis for an ATS claim against a corporation even in the absence of a decision from an international tribunal enforcing that norm against a corporation. *Id.* at 761 ("We cannot be bound to find liability only where international fora have imposed liability."); *contra Kiobel I*, 621 F.3d at 131–45. We explained that the absence of decisions finding corporations liable does not imply that corporate liability is a legal impossibility under international law, and also noted that the lack of decisions holding corporations liable could be explained by strategic considerations. *Sarei*, 671 F.3d at 761 (citing Jonathan A. Bush, *The Prehistory of Corporations and Conspiracy in International Criminal Law: What Nuremberg Really Said*, 109 Colum. L. Rev. 1094, 1149–68 (2009)). Rejecting an analysis that focuses on past enforcement, *Sarei* reaffirmed that corporate liability ultimately turns on an analysis of the norm underlying the ATS claim. *Id.* at 760–61 ("We . . . believe the proper inquiry is not whether there is a specific precedent so holding, but whether international law extends its prohibitions to the perpetrators in question.").

We thus established three principles about corporate ATS liability in *Sarei*, that we now reaffirm. First, the analysis proceeds norm-by-norm; there is no categorical rule of corporate immunity or liability. *Id.* at 747–48. Second, corporate liability under an ATS claim does not depend on the existence of international precedent enforcing legal norms against corporations. *Id.* at 760–61. Third, norms that are "universal and absolute," or applicable to "all actors," can provide the basis for an ATS claim against a corporation. *Id.* at 760. To determine whether a norm is universal, we

consider, among other things, whether it is "limited to states" and whether its application depends on the identity of the perpetrator. *Id.* at 764–65.

We conclude that the prohibition against slavery is universal and may be asserted against the corporate defendants in this case. Private, non-state actors were held liable at Nuremberg for slavery offenses. *The Flick Case*, 6 Trials of War Criminals (T.W.C.) 1194, 1202. Moreover, the statutes of the International Criminal Tribunals for Rwanda and the former Yugoslavia are broadly phrased to condemn "persons responsible" for enslavement of civilian populations. ICTY Statute Art. 5(c), U.N. S/RES/827 (May 25, 1993); ICTR Statute Art. 3(c), U.N. S/RES/955 (Nov. 8, 1994). The prohibition against slavery applies to state actors and non-state actors alike, and there are no rules exempting acts of enslavement carried out on behalf of a corporation. Indeed, it would be contrary to both the categorical nature of the prohibition on slavery and the moral imperative underlying that prohibition to conclude that incorporation leads to legal absolution for acts of enslavement. *Kiobel I*, 621 F.3d at 155 (Leval, J., concurring) ("The majority's interpretation of international law, which accords to corporations a free pass to act in contravention of international law's norms, conflicts with the humanitarian objectives of that body of law.").

A final point of clarification is in order about the role of domestic and international law. Although international law controls the threshold question of whether an international legal norm provides the basis for an ATS claim against a corporation, there remain several issues about corporate liability which must be governed by domestic law. This division of labor is dictated by international legal principles,

because international law defines norms and determines their scope, but delegates to domestic law the task of determining the civil consequences of any given violation of these norms. *Id.* at 172 (Leval, J., concurring); *Exxon*, 654 F.3d at 42–43; *Flomo*, 643 F.3d at 1020. Thus, when questions endemic to tort litigation or civil liability arise in ATS litigation—such as damages computation, joint and several liability, and proximate causation—these issues must be governed by domestic law. Many questions that surround corporate liability fall into this category, including, most importantly, the issue of when the actions of an individual can be attributed to a corporation for purposes of tort liability. Determining when a corporation can be held liable therefore requires a court to apply customary international law to determine the nature and scope of the norm underlying the plaintiffs' claim, and domestic tort law to determine whether recovery from the corporation is permissible.

Our holding that the norm against slavery is universal and thus may be asserted against the defendants addresses only the international legal issues related to corporate liability in this case. We do not address other domestic law questions related to corporate liability, and leave them to be addressed by the district court in the first instance.

## B. Aiding and Abetting Liability

We next consider whether the plaintiffs' complaint alleges the elements of a claim for aiding and abetting slavery. Customary international law—not domestic law—provides the legal standard for aiding and abetting ATS claims. *Sarei*, 671 F.3d at 765–66. When choosing between competing legal standards, we consider which one best reflects a consensus of the well-developed democracies of the

world.  *See Sosa*, 542 U.S. at 732 (directing federal courts to apply legal norms in ATS litigation that are accepted by "civilized nations"); *Khulumani*, 504 F.3d at 276 (Katzmann, J., concurring) (consulting the Rome Statute's aiding and abetting legal standard in part due to its wide acceptance among "most of the mature democracies of the world").

### 1.  *Mens Rea*

The plaintiffs argue that the required *mens rea* for aiding and abetting is knowledge, specifically, knowledge that the aider and abetter's acts would facilitate the commission of the underlying offense.  This knowledge standard dates back to the Nuremberg tribunals, and is well illustrated by the *Zyklon B Case*, 1 LAW REPORTS OF TRIALS OF WAR CRIMINALS 93 (1946).  There, the defendants supplied poison gas to the Nazis knowing that it would be used to murder innocent people, and were convicted of aiding and abetting war crimes. *Id.* at 101.  An analogous knowledge standard is applied in *The Flick Case*, where a defendant was convicted of aiding and abetting war crimes for donating money to the leader of the SS, knowing that it would be used to support a criminal organization.  6 T.W.C. 1216–17, 1220–21; *see also The Ministries Case*, 14 T.W.C. 622 (concluding that the defendant's knowledge regarding the intended use of a loan was sufficient to satisfy the *mens rea* requirement, but declining to find that the defendant satisfied the *actus reus* requirement).

As plaintiffs contend, this knowledge standard has also been embraced by contemporary international criminal tribunals.  The International Criminal Tribunals for Rwanda and the former Yugoslavia consistently apply a knowledge standard.  In *Prosecutor v. Blagojevic*, for instance, the

tribunal stated that "[t]he requisite mental element of aiding and abetting is knowledge that the acts performed assist the commission of the specific crime of the principal perpetrator." No. IT-02-60-A, ¶ 127 (ICTY, May 9, 2007) ("*Blagojevic*"); *see also Prosecutor v. Kayishema*, No. ICTR-95-1-T, ¶ 205 (ICTR, May 21, 1999); *Khulumani*, 504 F.3d at 277–79 (Katzmann, J., concurring) (observing that the ICTY and ICTR decisions apply a knowledge standard); *Exxon*, 654 F.3d at 33–34 (same). Additionally, after conducting an extensive review of customary international law, the Appeals Chamber of the Special Court for Sierra Leone recently affirmed this knowledge standard, concluding that "an accused's knowledge of the consequence of his acts or conduct—that is, an accused's 'knowing participation' in the crimes—is a culpable *mens rea* standard for individual criminal liability." *Taylor*, ¶ 483.

However, two of our sister circuits have concluded that knowledge is insufficient and that an aiding and abetting ATS defendant must act with the *purpose* of facilitating the criminal act, relying on the Rome Statute of the International Criminal Court, 37 I.L.M. 999 (1998) ("Rome Statute")[FN callout]. *See Aziz v. Alcolac, Inc.*, 658 F.3d 388, 399–400 (4th Cir. 2011); *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 259 (2d Cir. 2009). These circuits have interpreted the Rome Statute to bar the use of a knowledge standard because it uses the term "purpose" to define aiding and abetting liability:

> [A] person shall be criminally responsible and liable for punishment for a crime within the jurisdiction of the Court if that person . . . [f]or the *purpose* of facilitating the

commission of such a crime, aids, abets, or otherwise assists in its commission . . . .

Rome Statute, art. 25(3)(c) (emphasis added). Taking this text at face value, as the Second and Fourth Circuits did, it appears that the Rome Statute rejects a knowledge standard and requires the heightened *mens rea* of purpose, suggesting that knowledge standard lacks the universal acceptance that *Sosa* demands.

Here, we need not decide whether a purpose or knowledge standard applies to aiding and abetting ATS claims. We conclude that the plaintiffs' allegations satisfy the more stringent purpose standard, and therefore state a claim for aiding and abetting slavery. All international authorities agree that "*at least* purposive action . . . constitutes aiding and abetting[.]" *Sarei*, 671 F.3d at 765–66 (declining to determine whether the *mens rea* required for an aiding and abetting claim is knowledge or purpose).

Reading the allegations in the light most favorable to the plaintiffs, one is led to the inference that the defendants placed increased revenues before basic human welfare, and intended to pursue all options available to reduce their cost for purchasing cocoa. Driven by the goal to reduce costs in any way possible, the defendants allegedly supported the use of child slavery, the cheapest form of labor available. These allegations explain how the use of child slavery benefitted the defendants and furthered their operational goals in the Ivory Coast, and therefore, the allegations support the inference that the defendants acted with the purpose to facilitate child slavery.

The defendants' alleged plan to benefit from the use of child slave labor starkly distinguishes this case from other ATS decisions where the purpose standard was not met. *See Talisman*, 582 F.3d at 262–64; *Aziz*, 658 F.3d at 390–91, 401. According to the allegations here, the defendants have not merely profited by doing business with known human rights violators. Instead, they have allegedly sought to accomplish their own goals by supporting violations of international law. In *Talisman*, by contrast, the defendant did not in any way benefit from the underlying human rights atrocities carried out by the Sudanese military, and in fact, those atrocities ran contrary to the defendant's goals in the area, and even forced the defendant to abandon its operations. *Talisman*, 582 F.3d at 262. Similarly, in *Aziz*, the plaintiffs alleged that the defendants sold chemicals knowing they would be used to murder Kurds in northern Iraq, but failed to allege that the defendants had anything to gain from the use of chemical weapons. *Aziz*, 658 F.3d at 394, 401. Thus, in *Talisman* and *Aziz*, the purpose standard was not satisfied because the defendants had nothing to gain from the violations of international law, and in *Talisman*, the violations actually ran counter to the defendants' interest. Here, however, the complaint alleges that the defendants obtained a direct benefit from the commission of the violation of international law, which bolsters the allegation that the defendants acted with the purpose to support child slavery.

The defendants' control over the Ivory Coast cocoa market further supports the allegation that the defendants acted with the purpose to facilitate slavery. According to the complaint, the defendants had enough control over the Ivorian cocoa market that they could have stopped or limited the use of child slave labor by their suppliers. The defendants did not use their control to stop the use of child slavery,

however, but instead offered support that facilitated it. Viewed alongside the allegation that the defendants benefitted from the use of child slavery, the defendants' failure to stop or limit child slavery supports the inference that they intended to keep that system in place. The defendants had the means to stop or limit the use of child slavery, and had they wanted the slave labor to end, they could have used their leverage in the cocoa market to stop it. Their alleged failure to do so, coupled with the cost-cutting benefit they allegedly receive from the use of child slaves, strongly supports the inference that the defendants acted with purpose.

The defendants' alleged lobbying efforts also corroborate the inference of purpose. According to the complaint, the defendants participated in lobbying efforts designed to defeat federal legislation that would have required chocolate importers and manufacturers to certify and label their chocolate as "slave free." As an alternative to the proposed legislation, the defendants, along with others from the chocolate industry, supported a voluntary mechanism through which the chocolate industry would police itself. The complaint also alleges that when the voluntary enforcement system was eventually put into practice instead of legislation, it "in effect guaranteed the continued use of the cheapest labor available to produce [cocoa]—that of child slaves."

Despite these detailed allegations, the dissent contends that the complaint should be dismissed as implausible under *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). The allegation of purpose is not, however, a bare and conclusory assertion that is untethered from the facts underlying the plaintiffs' claims. Instead, the complaint specifically ties the defendants' alleged purpose to the defendants' economic goals in the

Ivory Coast, their control over the cocoa market, and their lobbying efforts. The factual allegations concerning the defendants' goals and business operations give rise to a reasonable inference that the defendants acted with purpose, and that is enough to satisfy *Iqbal*. *Id.* at 678–79; *Moss v. U.S. Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009) ("In sum, for a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief.").

We also disagree with the dissent's assertion that the plaintiffs have conceded that their allegations fail to satisfy the purpose standard. The plaintiffs have maintained throughout this appeal that the purpose standard has been satisfied. They only conceded that the defendants did not have the subjective motive to harm children. Indeed, the complaint is clear that the defendants' motive was finding cheap sources of cocoa; there is no allegation that the defendants supported child slavery due to an interest in harming children in West Africa.

This is not to say that the purpose standard is satisfied merely because the defendants intended to profit by doing business in the Ivory Coast. Doing business with child slave owners, however morally reprehensible that may be, does not by itself demonstrate a purpose to support child slavery. Here, however, the defendants allegedly intended to support the use of child slavery as a means of reducing their production costs. In doing so, the defendants sought a legitimate goal, profit, through illegitimate means, purposefully supporting child slavery.

Thus, the allegations suggest that a myopic focus on profit over human welfare drove the defendants to act with the purpose of obtaining the cheapest cocoa possible, even if it meant facilitating child slavery. These allegations are sufficient to satisfy the *mens rea* required of an aiding and abetting claim under either a knowledge or purpose standard.

2. *Actus Reus*

We next consider whether the plaintiffs have alleged the *actus reus* elements of an aiding and abetting claim. The *actus reus* of aiding and abetting is providing assistance or other forms of support to the commission of a crime. *Blagojevic*, ¶ 127; *Taylor*, ¶ 362; Rome Statute art. 25(3)(c). As both parties agree, international law further requires that the assistance offered must be substantial. *Blagojevic*, ¶ 127; *Taylor*, ¶ 362. The parties dispute, however, whether international law imposes the additional requirement that the assistance must be specifically directed towards the commission of the crime.

The "specific direction" requirement appears to have originated in decisions issued by the International Criminal Tribunal for the former Yugoslavia. *See Prosecutor v. Tadic*, Case No. IT-94-1-A (ICTY July 15, 1999); *Prosecutor v. Perisic*, Case No. IT-04-81-A, (ICTY Feb. 28, 2013) ("*Perisic*"). In *Tadic*, the Appeals Chamber used the phrase "specifically directed" to distinguish joint criminal enterprise liability from aiding and abetting liability. *Tadic*, ¶¶ 227–29. While joint criminal enterprise liability only requires an individual to engage in conduct that "in some way" assisted the commission of a crime, the Appeals Chamber stated that aiding and abetting liability requires an individual to engage in conduct that is "specifically directed" towards the

commission of a crime. *Id.* ¶ 229(ii). In *Perisic*, a later panel of the Appeals Chamber clarified that the specific direction requirement relates to the "link" between the assistance provided and the principal offense, and requires that "assistance must be 'specifically'—rather than 'in some way'—directed towards the relevant crimes." *Perisic* ¶ 27, 37 (quoting *Tadic*, ¶ 229).

Some Appeals Chamber panels and other international tribunals have explicitly rejected the specific direction requirement. *Prosecutor v. Mrksic*, Case No. IT-95-13/1-A, ¶ 159 (ICTY May 5, 2009) ("[T]he Appeals Chamber has confirmed that 'specific direction' is not an essential ingredient of the *actus reus* of aiding and abetting."); *Blagojevic*, ¶ 189 ("[S]pecific direction has not always been included as an element of the *actus reus* of aiding and abetting."); *Taylor*, ¶ 481. Beneath this controversy, however, there is widespread substantive agreement about the *actus reus* of aiding and abetting. As the Special Court for Sierra Leone Appeals Chambers recently affirmed, "[t]he actus reus of aiding and abetting liability is established by assistance that has a substantial effect on the crimes, not the particular manner in which such assistance is provided." *Taylor*, ¶ 475. What appears to have emerged is that there is less focus on specific direction and more of an emphasis on the existence of a causal link between the defendants and the commission of the crime. However, we decline to adopt an *actus reus* standard for aiding and abetting liability under the ATS. Instead, we remand to the district court with instructions to allow plaintiffs to amend their complaint in light of *Perisic* and *Taylor*, both of which were decided after the complaint in this case was dismissed and this appeal had been filed.

## C. Extraterritorial ATS Claims

The defendants' final argument contends that the plaintiffs' ATS claim seeks an extraterritorial application of federal law that is barred by the Supreme Court's recent decision in *Kiobel II*, 133 S. Ct. at 1669. We decline to resolve the extraterritoriality issue, and instead remand to allow the plaintiffs to amend their complaint in light of *Kiobel II.*

The Supreme Court's decision in *Kiobel II* is concerned with the application of the presumption against extraterritoriality to ATS claims. The presumption against extraterritoriality is a canon of statutory construction, and embodies the default assumption that legislation of Congress is only meant to apply within the territory of the United States. *Morrison v. Nat'l Austl. Bank Ltd.*, 130 S. Ct. 2869, 2877 (2010). Under this canon of construction, a statute should be construed to reach only conduct within the United States unless Congress affirmatively states that the statute applies to conduct abroad. *Id.* (quoting *EEOC v. Arabian Am. Oil Co.* (*Aramco*), 499 U.S. 244, 248 (1991)). The presumption is meant to provide "a stable background against which Congress can legislate with predictable effects," *Morrison*, 130 S. Ct. at 2881, and also "protect against unintended clashes between our laws and those of other nations which could result in international discord," *Aramco*, 499 U.S. at 248.

Since the presumption against extraterritoriality is a canon of statutory construction, it has no direct application to ATS claims, which, as discussed above, are claims created by federal common law, not statutory claims created by the ATS itself. *Kiobel II*, 133 S. Ct. at 1664. In *Kiobel II*, however,

the Supreme Court explained that the prudential concerns about judicial interference in foreign policy are particularly strong in ATS litigation, and concluded that "the principles underlying the presumption against extraterritoriality thus constrain courts exercising their power under the ATS." *Id.* The Court also concluded that nothing in the text, history, and purpose of the ATS rebutted the presumption of extraterritoriality. *Id.* at 1669.

Turning to the specific claims asserted by the *Kiobel II* plaintiffs, the Court observed that "all the relevant conduct took place outside the United States," and that the defendants were foreign corporations whose only connection to the United States lay in their presence in this country. *Id.* The Court held that these claims were therefore barred, reasoning that they sought relief for violations of international law occurring outside the United States, and did not "touch and concern the territory of the United States . . . with sufficient force to displace the presumption against extraterritorial application." *Id.*

*Kiobel II*'s holding makes clear that the general principles underlying the presumption against extraterritoriality apply to ATS claims, but it leaves important questions about extraterritorial ATS claims unresolved. *See id.* (Kennedy, J., concurring) ("The opinion for the Court is careful to leave open a number of significant questions regarding the reach and interpretation of the Alien Tort Statute."). In particular, *Kiobel II* articulates a new "touch and concern" test for determining when it is permissible for an ATS claim to seek the extraterritorial application of federal law. *Id.* But the opinion does not explain the nature of this test, except to say that it is not met when an ATS plaintiff asserts a cause of action against a foreign corporation based solely on foreign

conduct. *Id.* (Alito, J., concurring) (observing that the Court's formulation of the touch and concern test "obviously leaves much unanswered"); *see also Tymoshenko v. Firtash*, 2013 WL 4564646, at *4 (S.D.N.Y. Aug. 28, 2013) ("[T]he Court failed to provide guidance regarding what is necessary to satisfy the 'touch and concern' standard.").

The defendants argue that the touch and concern test is substantially the same as the "focus" test set out in *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. at 2884. *Morrison*'s focus test is a tool of statutory interpretation. It is used to determine when statutes without extraterritorial application can be applied to a course of conduct that occurred both domestically and abroad. *Id.* Under this test, courts first determine the "focus of congressional concern" for a statute, and allow the statute to be applied to a course of conduct if the events coming within the statute's focus occurred domestically. *Id.* (internal quotation marks omitted). In *Morrison*, for example, the Court reasoned that the focus of the Exchange Act is the purchase and sale of securities, and therefore held that it applies only to "transactions in securities listed on domestic exchanges, and domestic transactions in other securities." *Id.* The Court then held that the anti-fraud provisions of the Exchange Act did not apply to a foreign sale of securities that were listed on an Australian exchange. *Id.* at 2888.

*Morrison* may be informative precedent for discerning the content of the touch and concern standard, but the opinion in *Kiobel II* did not incorporate *Morrison*'s focus test. *Kiobel II* did not explicitly adopt *Morrison*'s focus test, and chose to use the phrase "touch and concern" rather than the term "focus" when articulating the legal standard it did adopt. Moreover, the assertion that *Kiobel II* meant to direct lower

courts to apply the familiar *Morrison* focus test is belied by the concurring opinions, which note that the standard in *Kiobel II* leaves "much unanswered." *Kiobel II*, 133 S. Ct. at 1669 (Alito, J., concurring); *see also id.* (Kennedy, J., concurring). Additionally, since the focus test turns on discerning Congress's intent when passing a statute, it cannot sensibly be applied to ATS claims, which are common law claims based on international legal norms.

Rather than attempt to apply the amorphous touch and concern test on the record currently before us, we conclude that the plaintiffs should have the opportunity to amend their complaint in light of *Kiobel II*. It is common practice to allow plaintiffs to amend their pleadings to accommodate changes in the law, unless it is clear that amendment would be futile. *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 972 (9th Cir. 2009) ("Having initiated the present lawsuit without the benefit of the Court's latest pronouncements on pleadings, Plaintiffs deserve a chance to supplement their complaint . . ."). Here, the plaintiffs seek to amend their complaint to allege that some of the activity underlying their ATS claim took place in the United States. On the record before us, we are unable to conclude that amendment would be futile, because unlike the claims at issue in *Kiobel II*, the plaintiffs contend that part of the conduct underlying their claims occurred within the United States. *See Kiobel II*, 133 S. Ct. at 1669. Moreover, it would be imprudent to attempt to apply and refine the touch and concern test where the pleadings before us make no attempt to explain what portion of the conduct underlying the plaintiffs claims took place within the United States.

We therefore decline to determine, at present, whether the plaintiffs' ATS claim is barred by the Supreme Court's

holding in *Kiobel II*, and remand this case to allow the plaintiffs to amend their complaint.

## IV.  Conclusion

The district court's order is **REVERSED**, and we **VACATE** for further proceedings consistent with this opinion.**[2]**

**IT IS SO ORDERED**.

RAWLINSON, Circuit Judge, concurring in part and dissenting in part:

I do not object to remanding this case to afford the Plaintiffs an opportunity to further amend their Complaint in an attempt to state a cause of action under the Alien Tort Statute (ATS), as recently interpreted by the United States Supreme Court in *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013).  I doubt that their effort will be successful in view of their prior candid acknowledgment in their Opening Brief on appeal that "they do not currently possess facts sufficient to support the district court's standard that Defendants specifically intended the human rights violations at issue in this case. . . ."  Nevertheless, because I cannot say with certitude that any attempt to further amend the Complaint would be futile, I voice no objection to a remand on that basis.

---

**[2]** We need not reach the parties' remaining arguments in light of our decision to remand with instructions that the district court allow leave to amend.

We all agree that the practice of engaging in child slave labor is reprehensible, indefensible, and morally abhorrent. Indeed, if that were the issue we were called upon to decide, this would be an easy case.  Instead, we must decide who bears legal responsibility for the atrocities inflicted upon these Plaintiffs, forced into slave labor as children.  More precisely, we must determine if the named Defendants in this case may be held legally responsible for the injuries alleged by the Plaintiffs.

I also agree that corporations are not *per se* excluded from liability under the ATS.  *See Majority Opinion*, pp. 16–18 (adopting the reasoning of our en banc decision in *Sarei v. Rio Tinto*, *PLC*, 671 F.3d 736, 747 (9th Cir. 2011), *vacated for further consideration in light of Kiobel*, 133 S. Ct. 1995 (2013); *see also Romero v. Drummond Co. Inc.*, 552 F.3d 1303, 1315 (11th Cir. 2008) ("The text of the Alien Tort Statute provides no express exception for corporations . . .") (citation omitted).

I.

*Mens Rea Requirement of the ATS*

Unlike the majority, I would definitely and unequivocally decide that the purpose standard applies to the pleading of aiding and abetting liability under the ATS.  In other words, Plaintiffs seeking to assert a claim against Defendants on an aiding and abetting theory of liability must allege sufficient facts to state a plausible claim for relief, *i.e.*, that the

defendants acted with the purpose[1] of causing the injuries suffered by the Plaintiffs.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009) (delineating the pleading standard under Rule 8 of the Federal Rules of Civil Procedure).

I am persuaded to this view in part by the rationale set forth by our sister circuits in the cases of *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 259 (2d Cir. 2009) and *Aziz v. Alcolac, Inc.*, 658 F.3d 388, 400–01 (4th Cir. 2011).

In *Talisman*, the Second Circuit considered the claims of Sudanese citizens against the government of Sudan and Talisman, a corporation that allegedly aided and abetted the government of Sudan in its commission of human rights abuses against the Plaintiffs.  The Second Circuit expressly relied upon the principles for "imposing accessorial liability under the ATS" previously articulated by the United States Supreme Court in *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), the first Supreme Court case interpreting the ATS. *See Talisman*, 582 F.3d at 248, 255.  The Second Circuit referenced the language in *Sosa* clarifying that the ATS was enacted with an understanding that the number of actionable international law violations would be "modest."  *Id*. at 255 (quoting *Sosa*, 542 U.S. at 724).  The Second Circuit also

---

[1] I use the term "purpose" interchangeably with the phrase "specific intent" because there is no material difference between the two.  *See United States v. Gracidas-Ulibarry*, 231 F.3d 1188, 1196 (9th Cir. 2000) ("In general, 'purpose' corresponds to the concept of specific intent . . .") (citations omitted); *see also United States v. Meredith*, 685 F.3d 814, 826 (9th Cir. 2012) ("Jury Instruction 52 defines willfully as an act done voluntarily and intentionally and with the specific intent to do something the law forbids; that is to say with a purpose either to disobey or disregard the law. . . .") (internal quotation marks omitted).

recounted the reasons articulated by the Supreme Court in *Sosa* for exercising "great caution" before recognizing violations of international law that are not based on international norms recognized in 1789. *Id.*

In *Sosa*, the Supreme Court first focused on the need for exercising caution when considering the availability of claims under the ATS, due to the marked difference between the conception of the common law in 1789 when the ATS was enacted, and the conception of the common law in more modern times. *See Sosa*, 542 U.S. at 725–26. Prior to the Supreme Court's decision in *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938), the common law was conceived of as a non-preemptive body of general (non-federal) common law. *See* Curtis Bradley, *International Law in the U.S. Legal System*, 211 (Oxford University Press, 2013). Today, judicially recognized claims under the ATS would be considered preemptive federal common law, thereby extending the reach of federal law. *See id.*

Relatedly, the Supreme Court cautioned federal courts to tread lightly when considering whether to further expand the federal law in a manner "of particular importance to foreign relations." *Sosa*, 542 U.S. at 726. Rather than assuming an "aggressive role" in recognizing claims under the ATS, a statute "that remained largely in shadow for much of the prior two centuries," the Supreme Court suggested looking to guidance from the legislative branch before embarking on "innovative" substantive expansion of the ATS. *Id.*

Next, the Supreme Court expressed reluctance to create a private right of action in the absence of an express legislative provision addressing private rights of action, particularly when the effect is to render international rules

subject to private action, thereby implicating the management of foreign affairs that are generally best left to "the discretion of the Legislative and Executive Branches." *Id*. at 727. The Supreme Court noted that international law "very much" concerns itself with defining permissible limits on the power of sovereign governments over their own citizens, a notion that inherently merits the utmost trepidation. *Id*. at 727–28.

Finally, the Supreme Court recognized that it is "particularly important" that the federal courts lack a legislative "mandate to seek out and define new and debatable violations of the law of nations." *Id*. at 728. For these reasons, the Supreme Court urged "great caution in adapting the law of nations to private rights." *Id*. Indeed, the Supreme Court, in recognition of the potential negative implications of construing the ATS too broadly, construed the ATS as legislation "meant to underwrite litigation of a *narrow set* of common law actions derived from the law of nations . . ." *Id*. at 721 (emphasis added). The Supreme Court instructed that judicial power should be exercised to recognize causes of action under the ATS sparingly, "subject to vigilant doorkeeping" by the federal courts. *Id*. at 729.

In *Talisman*, the Second Circuit absorbed the Supreme Court's repeated emphasis on the "modest" and "narrow" nature of the claims that should be recognized under the ATS, and rejected the Plaintiffs' argument for a "broad and elastic" principle of aiding and abetting liability under the ATS. 582 F.3d at 255, 259. Rather, in keeping with the "modest" and "narrow" approach described with approval in *Sosa*, the Second Circuit adopted the purpose standard as the applicable *mens rea* test for aiding and abetting liability under the ATS. *See id*. at 259. As the Second Circuit noted, there is no international consensus supporting the imposition of liability

on individuals who act with knowledge of the violation of international law, but who harbor no intent or purpose to aid and abet the violation.  *See id*.

In a similar vein, the Fourth Circuit cited "the Supreme Court's admonitions in *Sosa* that we should exercise great caution, before recognizing causes of action for violations of international law" and agreed with the Second Circuit that aiding and abetting liability under the ATS must be predicated on a showing of purposeful facilitation of the violation of international law.  *Aziz*, 658 F.3d at 401 (internal quotation marks omitted).

I agree with the Second and Fourth Circuits that the principles set forth in *Sosa* militate in favor of the application of a *mens rea* of purpose or specific intent to impose aiding and abetting liability under the ATA, and I would so hold.

Applying the proper *mens rea* standard of purpose, or specific intent, I strongly disagree that the allegations in Plaintiffs' Amended Complaint satisfy that standard.  The contrary conclusion reached by the majority is particularly curious in light of the Plaintiffs' concession of their inability to meet the standard.  Nevertheless, the majority generally relies upon allegations in the Amended Complaint as sufficient to establish that Defendants acted with the purpose to aid and abet child slavery.  The majority focuses on inferences rather than on any particular allegations in the Amended Complaint that reflect the purpose *mens rea.*  The only allegation from the Amended Complaint that is specifically referenced is the allegation that "[d]riven by the goal to reduce costs in any way possible, the defendants allegedly supported the use of child labor, the cheapest form of labor available . . . ."  *Majority Opinion*, p. 22.  The

majority concludes that "[r]eading the allegations in the light most favorable to the plaintiffs, one is led to the inference that the defendants placed increased revenues before basic human welfare, and intended to pursue all options available to reduce their cost for purchasing cocoa." *Id.* at 22  Piling inference upon inference, the majority contends that the allegations that the defendants placed increased revenues before human welfare and acted with the intent to reduce the cost of purchasing cocoa, "support the inference that the defendants acted with the purpose to facilitate child slavery." *Id*. at 22.  But is that inference plausible, as required by *Iqbal*?  I think not, because these allegations are remarkably similar to those rejected by the Supreme Court in *Iqbal*.

The Plaintiff in *Iqbal* filed a *Bivens*[2] action against the Attorney General of the United States and the Director of the Federal Bureau of Investigations, asserting that the defendants violated his constitutional rights by subjecting him to inhumane conditions of confinement due to his race, national origin or religion.  *See Iqbal*, 556 U.S. at 668–69.  Iqbal alleged that the Defendants "knew of, condoned, and willfully and maliciously agreed to subject [Iqbal] to harsh conditions of confinement as a matter of policy, solely on account of [Iqbal's] religion, race, and/or national origin . . ." *Id*. at 680 (internal quotation marks omitted).  The Supreme Court rejected this allegation as a "bare assertion [ ], amount[ing] to nothing more than a formulaic recitation of the elements of a constitutional discrimination claim . . ." *Id*. at 681 (citation and internal quotation marks omitted).  The Supreme Court added that the allegation was "conclusory" and "disentitle[d] . . . to the presumption of truth."  *Id*.

---

[2] *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

The same can be easily said of the one specific allegation relied on by the majority in this case.  The allegation that Defendants acted with the intent "to reduce costs in any way possible" is at best a feeble attempt to set forth the required *mens rea* of purpose, or specific intent.  However, as the Supreme Court noted in *Iqbal*, a conclusory statement of the elements of a claim falls far short of stating a plausible claim. *See id*.

The statement that child slavery is the cheapest form of labor available does not even implicate the Defendants.  This allegation in no way raises a plausible inference that the Defendants acted with the purpose to aid and abet child slave labor.  It may well be true that child slave labor is the cheapest form of labor for harvesting cocoa.  But that unvarnished statement in no way supports the inferential leap that because child slave labor is the cheapest form of labor, Defendants aided and abetted the cocoa farmers who allegedly operated the child slave labor system.

To bolster the inferences discussed, the majority explains that Defendants' "use of child slavery benefitted the defendants and furthered their operational goals in the Ivory Coast . . . " *Majority Opinion*, pp. 22–23.  However, taking advantage of a favorable existing market, while perhaps morally repugnant, does not equate to the specific intent to aid and abet child slave labor.  In *Aziz*, 658 F.3d at 390–91, the corporate defendant sold restricted chemicals that ultimately reached Iraq and were used to manufacture mustard gas.  The mustard gas in turn was used to attack Kurds.  Thousand of Kurds were killed, maimed, or left with "physical and psychological trauma." *Id*. at 391.  Plaintiffs, individuals of Kurdish descent, were victims of mustard gas attacks themselves, or family members of deceased victims.

They brought claims under the ATS, alleging that the corporate defendant "aided and abetted the Iraqi regime's use of mustard gas to attack the Kurds. . . ." *Id*. at 395.  Plaintiffs specifically alleged that the corporate defendant "placed [the restricted chemical] into the stream of international commerce with the purpose of facilitating the use of said chemicals in the manufacture of chemical weapons to be used, among other things, against the Kurdish population in northern Iraq." *Id*. at 401 (citation omitted).  Citing *Iqbal*, the Fourth Circuit characterized the allegations as "cursory" and "untethered to any supporting facts." *Id*.  Unfortunately, that same characterization accurately describes the allegations made by Plaintiffs in this case.

The aiding and abetting claims asserted under the ATS in *Talisman* met a similar fate in the Second Circuit.  Plaintiffs alleged that Talisman, a corporation, provided "substantial assistance" to the government of Sudan, which assistance aided the government in "committing crimes against humanity and war crimes . . ."  582 F.3d at 261.  The assistance provided by Talisman to the government included: 1) upgrading airstrips; 2) designating areas for oil exploration; 3) paying royalties to the government; and "giving general logistical support to the Sudanese military . . . ." *Id*. (citation and footnote reference omitted). The Second Circuit observed that there was nothing inherently nefarious about these activities.  Rather, such activities "generally accompany any natural resource development business or the creation of any industry. . . ." *Id*. (citation omitted).  In essence, Plaintiffs argued that Talisman should have made no financial investment in Sudan at all, lest the financial wherewithal enable the government to abuse its citizenry.  However, as in *Aziz*, the allegations were insufficient to support a plausible inference that Talisman

acted with the required *mens rea* of purpose or specific intent. *See id*. at 263; *see also Aziz*, 658 F.3d at 401.

The majority seeks to distinguish *Aziz* and *Talisman*, but no principled distinction can be made. The majority points to the fact that Defendants in this case had sufficient control over the cocoa market "that they could have stopped or limited the use of child slave labor by their suppliers." *Majority Opinion*, p. 23. Rather than doing so, the majority concludes, Defendants "instead offered support that facilitated" child slavery. *Id*. at 24. This reasoning mirrors the argument rejected by the Second Circuit that Talisman should never have made a financial investment in Sudan, thereby enabling that country to oppress its people. *See Talisman*, 582 F.3d at 262–63. Rejection of this argument is particularly appropriate in the absence of evidence that Defendants intended that the financial support be used for child slavery. *See id*. at 262.

The majority also points to Defendants' lobbying efforts to "corroborate the inference of purpose." *Majority Opinion*, p. 24. "[T]he defendants participated in lobbying efforts designed to defeat federal legislation that would have required chocolate importers and manufacturers to certify and label their chocolate as slave free." *Id*. at p. 24 (internal quotation marks omitted). In the alternative, Defendants and others with interest in the chocolate industry advocated for the implementation of a voluntary compliance mechanism. *See id*. at p. 24. However, exercising their right to petition the government does not reasonably support an inference that Defendants acted with the purpose to aid and abet child slavery. It is equally likely that Defendants sought to avoid additional government regulation. As recognized by the Second Circuit, if there is a benign explanation for the

corporation's action, no plausible inference of purpose may be drawn. *See Talisman*, 582 F.3d at 262.

Plaintiffs and the majority concede that any and all actions taken by Defendants were motivated by the desire for profits rather than an intent to enslave children. *See Majority Opinion*, pp. 22–24. This concession is fatal to the Amended Complaint as presently couched. There is absolutely no allegation that Defendants have violated any governing law or regulation in their quest for profits. And profit-seeking is the reason most corporations exist. To equate a profit-making motive with the *mens rea* required for ATS aiding and abetting liability would completely negate the constrained concept of ATS liability contemplated by the Supreme Court in *Sosa*. *See* 542 U.S. at 721, 724, 729 (construing the ATS as encompassing a "modest" and "narrow" set of claims "subject to vigilant doorkeeping by the federal courts") (internal quotation marks omitted).

One would hope that corporations would operate their businesses in a humanitarian and morally responsible manner. It is indeed unfortunate that many neglect to do so. However regrettable that circumstance may be, we cannot substitute the lack of humanitarianism for the pleading requirements that govern the ATS. Following the reasoning of *Sosa*, *Aziz* and *Talisman*, I would *not* conclude that the Plaintiffs have stated a claim under the ATS.

II.

*Extraterritorial Reach of the ATS*

As stated earlier, I do not object to a remand to allow Plaintiffs to seek to further amend their Complaint in light of

the Supreme Court's recent *Kiobel* decision. However, in my view, Plaintiffs face a substantial hurdle in their effort to assert a viable claim that the ATS applies to the admittedly extraterritorial child slave labor that is the basis of this case. As noted by the majority, Justice Kennedy observed that the *Kiobel* opinion left open "a number of significant questions regarding the reach and interpretation of the Alien Tort Statute. . . ." *Kiobel*, 133 S. Ct. at 1669 (Kennedy, J. concurring). But a question not left open regarding the reach of the ATS was the presumption against extraterritorial application of the statute. *See id*. at 1664–67.

In *Kiobel*, Plaintiffs sued corporate defendants who participated in oil exploration and production in Nigeria. In their Complaint, Plaintiffs alleged that after they protested against the environmental effects of the corporation's practices, "Nigerian military and police forces attacked . . . villages, beating, raping, killing, and arresting residents and destroying or looting property." *Id*. at 1662. According to Plaintiffs, the corporate defendants aided and abetted their tormentors "by, among other things, providing the Nigerian forces with food, transportation and compensation, as well as by allowing the Nigerian military to use respondents' property as a staging ground for attacks." *Id*. at 1662–63.

The Supreme Court explained that the presumption against extraterritorial application of federal statutes avoids "unintended clashes between our laws and those of other nations which could result in international discord." *Id*. at 1664 (citation omitted). The Supreme Court noted that the concern underlying the presumption is heightened in cases brought under the ATS because those cases seek relief based on court-created causes of action rather than for claims expressly provided for by Congress. *See id*. Referring back

to *Sosa*, the Supreme Court reiterated its emphasis on "the need for judicial caution in considering which claims could be brought under the ATS . . ." *Id*. Indeed, the foreign policy implications of recognizing a claim under the ATS "are all the more pressing when the question is whether a cause of action under the ATS reaches conduct within the territory of another sovereign." *Id*. at 1665.

The Supreme Court observed that "nothing in the text of the [ATS] suggests that Congress intended causes of action recognized under it to have extraterritorial reach. . . ." *Id*. Similarly, nothing in the historical backdrop of the statute overcomes the presumption against extraterritorial application of the ATS. *See id*. at 1666. Finally, the Supreme Court emphasized that there was no indication that Congress intended to make this country the forum "for the enforcement of international norms. . . ." *Id*. at 1668.

Having articulated these underlying precepts, the Supreme Court concluded that the ATS was subject to the presumption against extraterritorial application and that Plaintiffs' "case seeking relief for violations of the law of nations occurring outside the United States [was] barred . . ." *Id*. at 1669. On the facts as alleged by Plaintiffs, "all the *relevant conduct* took place outside the United States." *Id*. (emphasis added). The Supreme Court further explained that even in a case where the claims did "touch and concern the territory of the United States, they must do so with sufficient force to displace the presumption against extraterritorial application. . . ." *Id*. (citing *Morrison v. Nat'l Australia Bank Ltd*., 561 U.S. 247, 264–73 (2010)).

In *Morrison*, the Supreme Court held, in no uncertain terms, that when an allegation of domestic relationship is

raised to defeat the presumption against extraterritoriality, that domestic relationship must coincide with "the focus of congressional concern . . ." *Id*. at 266 (citation omitted). I do not agree with the majority that the Supreme Court "did not incorporate *Morrison's* focus test." *Majority Opinion*, p. 30. Why else would the Supreme Court direct us to *Morrison* precisely when it was discussing claims that allegedly "touch and concern" the United States? *Kiobel*, 133 S. Ct. at 1669. In any event, at a minimum, the Supreme Court has made clear that not any old domestic contact will do. Rather, the Supreme Court has colorfully informed us that the burden of showing sufficient domestic contact is substantial. *See Morrison*, 561 U.S. at 266 ("[T]he presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case . . . .") (emphasis in the original).

In sum, I would affirm the district court's ruling that the Amended Complaint failed to state a claim under the ATS. In reviewing the next amended Complaint, the district court should hew closely to the guidance that the Supreme Court laid out in *Morrison*, *Sosa* and *Kiobel* that cautions federal court judges to tread lightly both when determining whether a claim has been stated under the ATS and whether the presumption against extraterritorial application of a domestic statute has been rebutted. These cases militate toward contraction rather than expansion. Therefore, I concur in a remand to allow Plaintiffs to further amend their Complaint in an effort to state a claim under the ATS. I dissent from any holding that they have adequately done so.